**Eugene H. BANDEEN,**
**Plaintiff-Appellant,**

v.

**UNITED CARRIERS (PANAMA), INC., Japan Line, Ltd., and Nichimen Co., Inc., Defendants-Appellees.**

**No. 81–3641.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1982.

Decided Aug. 12, 1983.

Raymond J. Conboy, Pozzi, Wilson, Atchison, Kahn & Oleary, Portland, Or., for plaintiff-appellant.

John R. Brooke, Wood, Tatum, Mosser, Brooke & Holden, Katherine O'Neil, Randall B. Kester, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for defendants-appellees.

Before GOODWIN, PREGERSON, and CANBY, Circuit Judges.

GOODWIN, Circuit Judge:

Bandeen sued under section 905(b)[1] of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, for damages for injuries caused in a fall from a ship while loading logs. Defendants are the shipowner, United Carriers (Panama), Inc. (United); the time charterer, Japan Line, Ltd. (Japan Line); and the subcharterer, Nichimen Co., Inc. (Nichimen).[2] At the close of the evidence the district court directed verdicts in favor of all defendants. Plaintiff appeals. We affirm.

---

1. 33 U.S.C. § 905(b) provides in relevant part:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsec-

tion shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred...."

33 U.S.C. § 902(21) provides:

"The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."

2. For convenience we refer generally to the potential liability of all defendants as "shipowner liability."

## I

On February 16, 1978, the ship *Grand Spruce* was in the Port of Astoria, Oregon, to take on logs bound for Japan. Nichimen, the ship's subcharterer, had engaged the Jones-Oregon Stevedore Co. (Jones-Oregon) to load the ship. Crew members of the *Grand Spruce* and an agent of Nichimen were on board the vessel when the Jones-Oregon gangs arrived for work and remained there throughout the day's loading.

Bandeen was a member of one of the Jones-Oregon gangs employed on the *Grand Spruce* on February 16. By mid-afternoon the gangs had filled the hold and were working on deck, placing logs between steel stanchions installed vertically at regular intervals along the starboard and port rails of the vessel. Bandeen and a fellow longshoreman were positioned several feet above the deck on a pile of logs stowed parallel with the rails. Their job was to move the logs to achieve a solid stow. As Bandeen was walking on a log, its bark gave way. He tumbled into the Columbia River, striking a floating boom stick in the water. He injured his shoulder and has been unable to return to work.

Bandeen contends that defendants were negligent in their failure to provide safety wires or netting between the stanchions which could have kept a workman from going overboard. Most of the testimony presented during the two-day jury trial concerned the hazards associated with loading logs on ships and the safety practices of the industry. It was established that falls into the water are such a common peril to longshoremen working on logs on deck that Jones-Oregon makes it a practice to place life lines in the water. On the day of Bandeen's fall, a safety boat was also standing by to retrieve any longshoremen who might fall in the water. One defense witness, Captain Hill, a master mariner, testified that the principal means used by longshoremen to prevent falls into the water when loading logs is a special caulked boot, but the steel caulks, which bite into the bark, afford little protection when, as in this instance, the logs are hemlock. According to Captain McKimmey, another master mariner called by defendants, hemlock logs readily shed their bark when walked on. Captain Hill also stated that a second safety measure, a harness on a lanyard, so limits mobility and impairs performance that it is seldom used.

Captain Hill further testified that safety netting or lines rigged between the stanchions could partially reduce the risk of a falling longshoreman going over the side. He added, however, that lines and nets are not widely used because they could be damaged in the loading process. Captain McKimmey's testimony supported Hill's, but McKimmey stated that the problem of damage to lines or nets could be controlled through the use of wire. McKimmey also stated that safety lines or nets could create a new danger: logs caught in a line or net could pivot and swing across the deck, sweeping longshoremen over the side.

Louis Brock, a veteran longshoreman, testified that the most effective safety measure would be permanent reach wires strung between the stanchions at intervals of four feet. McKimmey testified to the factors that could influence a stevedore's decision not to rig such wires. McKimmey stated that the stevedore business is highly competitive and that customers do not want stevedores to "drag out [their] work" by taking extra steps, such as rigging lines, during the loading process. Brock also testified that lines rigged between the stanchions would become part of the ship's stowage. This claim was confirmed by McKimmey: "You have to remember whatever you rig is going out with the ship. So you wouldn't want to buy it if you could not charge it back to the ship." He added that if the practice of rigging lines became standard there would be a demand that ships provide lines as part of their gear. "It is the same as stanchions. We didn't used to have stanchions," McKimmey said.

At the close of the evidence, the district court granted defendants' motions for directed verdicts. The court determined that under the provisions of the Longshoremen's and Harbor Workers' Compensation Act,

the stevedore was solely responsible for Bandeen's safety. The court stated: "The stevedore is hired for its expertise in the handling of cargo safely, and the basic policy decisions of safety . . . must be entrusted to the stevedore company." The court granted Japan Line's motion for "the further reason that . . . [no] evidence shows us that they were involved to any extent in the operation."

## II

■ In determining the propriety of a directed verdict, district and appellate courts follow the same standard: a directed verdict is proper if the evidence permits only one reasonable conclusion. *Cal. Computer Products, Inc. v. Intern. Business Machines,* 613 F.2d 727, 732–33 (9th Cir.1979). To avoid passing on the credibility of witnesses and weighing contradictory evidence, however, the court must resolve all inferences in favor of the party with the burden of persuasion.[3] The motion should be denied if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in favor of the party opposing the motion. *Id.* at 734. *See Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938).

## III

All parties agree that the Supreme Court's decision in *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), provides the analytical framework for this case. Under *Scindia,* the shipowner must provide a reasonably safe workplace under the circumstances by having

"[T]he ship and its equipment in such condition that an expert and experienced

stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Id.* at 167, 101 S.Ct. at 1622.

■ Under *Scindia,* if the stevedore's use of defective ship's gear or failure to correct a dangerous condition is "so obviously improvident" as to present an unreasonable risk of harm to the longshoremen, the shipowner with actual or constructive knowledge of the defect or danger has a duty to intervene and repair the equipment or remedy the dangerous condition. *Id.* at 175–76, 101 S.Ct. at 1626–27. Bandeen argues that his evidence tended to prove that the shipowner breached both the duty to provide a safe workplace and the duty to intervene. Occupational Safety and Health Administration regulations require stevedores to use nets or other safety equipment whenever longshoremen are exposed to the risk of falls from cargo stowed more than eight feet high.[4] If nets or lines were needed, it was the duty of the stevedore to provide them.

The evidence tended to show that lines, either of wire rope or of other material, if stretched between the stanchions, would have provided some additional protection against falling overboard. There was evidence that such lines could have negative as well as potentially positive qualities: (1) the

---

**3.** This test is a hybrid of the so-called "new trial" and "most favorable evidence" tests. The former involved passing on the credibility of witnesses and weighing contradictory evidence, whereas the latter did not; and the former permitted consideration of all the evidence, whereas the latter did not. 613 F.2d at 733 n. 3.

**4.** 29 C.F.R. § 1918.32(b) (1982) provides:

"When an edge of a hatch section or of stowed cargo more than 8 feet high is so exposed that it presents a danger of an employee falling, the edge shall be guarded by a safety net of adequate strength to prevent injury to a falling employee, or by other means providing equal protection under the existing circumstances."

ship would sail away with them, so their cost would have to be added to the cost of the work; and (2) they could cause, as well as prevent, injury. All of this evidence proved that lines might have made the workplace safer, but did not establish whose duty it was to provide them.

The plaintiff wanted the court to permit the jury to decide whether these considerations made it "unreasonable" for the ship to leave the matter of additional lines to the stevedore. The defendants argue that the court correctly decided, as a matter of law, that it was the stevedore's exclusive duty to provide whatever additional safety features were needed, and that it was not the ship's responsibility to do so.

In *Davis v. Partenreederei M.S. Normannia,* 657 F.2d 1048 (9th Cir.1981), the shipowner had placed the ship's gangway too close to the cargo landing area. Occupational Safety and Health Administration regulations prohibit the passing of cargo over a gangway or the landing of cargo in close proximity to a gangway. 29 C.F.R. § 1918.21(i) (1982). Although only the stevedore was directly accountable for violating the regulation, the shipowner was held partially liable for injuries to a longshoreman struck by landing cargo as he walked off the gangway. The court held that, once the shipowner appreciated the continuing danger posed by its own positioning of the gangway, the jury could find that it had a duty to intervene and remedy the dangerous condition. 657 F.2d at 1052.

The plaintiff cites *Davis* for the proposition that the lack of nets was an obvious breach of the duty of care by the stevedore and therefore subjects the shipowner to liability for breach of a duty to intervene to stop the stevedore's work. One problem with this reasoning is that in *Davis,* the ship's crew had positioned the gangway and thereby created the hazard. *Scindia* states "... we cannot agree that the vessel's duty to the longshoreman requires the shipowner to inspect or supervise the stevedoring operation. Congress intended to make the vessel answerable for its own negligence and to terminate its auto-

matic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore. Cases holding the vessel liable on the ground that it owed nondelegable duties to protect the longshoremen from injury were rejected.... '[C]reation of a shipowner's duty to oversee the stevedore's activity and insure the safety of longshoremen would ... saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b)'". (Citations omitted.) 451 U.S. at 168–169, 101 S.Ct. at 1622–1623.

Here the shipowner had notice of a probable safety violation by the stevedore from the outset of the loading. But the cases since the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act do not hold that such knowledge alone creates a shipowner duty to intervene. In *Davis v. Partenreederei M.S. Normannia, supra,* the shipowner's placement of the ship's own equipment helped to create the hazard. In *Gill v. Hango Ship-Owners/AB,* 682 F.2d 1070 (4th Cir.1982), the triable issue was whether paper rolls had been stowed too tightly by the defendant shipowner itself. In *Bueno v. United States,* 687 F.2d 318 (9th Cir.1982), plaintiff alleged that the defendant shipowner voluntarily undertook a duty of inspection and breached it, precluding summary judgment. In this case, the shipowner's equipment and acts did not cause the injury.

■ Giving the evidence the strongest inferences in favor of the plaintiff, the best that can be said is that the ship did not string horizontal lines between the stanchions, and did not insist that the stevedore do so. In light of the legislative history of the 1972 amendments, we are satisfied that the ship had neither the duty to rig the lines, nor the duty to intervene in the stevedore's decision not to do so.

■ The statutory scheme now places the duty of providing safety appliances upon the stevedore, and the stevedore remains liable for injuries to workmen that result

from any such failure. The amount of that liability was increased by the 1972 amendments. It is the exceptional case, under *Scindia,* in which the shipowner remains liable as a "deep pocket" defendant, when it turns the vessel over to the stevedore for loading. This was not one of the exceptional cases. To permit a jury to reimpose, under the guise of negligence, back-up liability for the stevedore's failure to provide adequate safety devices would be to repeal the statutory amendments and restore the pre-1972 practice which allowed longshoremen and their employers to pass the costs of loading and unloading accidents back to the ship under the rubric of unseaworthiness. The trial court correctly refused to frustrate the intent of Congress in this manner.

Affirmed.

PREGERSON, Circuit Judge, dissenting:

I respectfully dissent. I do not read the cases relied upon by the majority to hold that a shipowner is insulated from liability simply because, in the words of the majority, it neither "helped to create the hazard" nor "voluntarily undertook a duty of inspection and breached it."[1] To the contrary, the Supreme Court in *Scindia* stated expressly that a shipowner has a duty to intervene when the stevedore's continued use of defective ship's gear is "so obviously improvident" that it presents an unreasonable risk of harm to longshoremen. 451 U.S. at 175–76, 101 S.Ct. at 1626–27. This duty, which the majority jettisons, arises despite the fact that "whether [the ship's gear] could be safely used or whether it posed an unreasonable risk of harm to ... longshoremen was a matter of judgment committed to the stevedore in the first instance." *Id.* Here, a reasonable jury could have found that the

stevedore's conduct exposed the longshoremen to such an unreasonable risk of harm that the duty to intervene imposed on the shipowner required it to remedy the dangerous condition. As the district court noted, the record contains ample evidence from which a reasonable jury could have concluded that some of the defendants had actual knowledge that Jones-Oregon, in violation of Occupational Safety and Health Administration regulations, permitted its longshoremen to load logs within stanchions that were not rigged with safety nets or lines to prevent falls overboard. This strengthens the possibility that a reasonable jury could have found Jones-Oregon's conduct "so obviously improvident" that the shipowner was dutybound to step in.

Moreover, a reasonable jury could have concluded that the shipowner, by not equipping the stanchions with permanent reach wires, failed to provide a workplace in which an experienced longshoreman could, by the exercise of reasonable care, carry on his work with reasonable safety. The defendants' own expert witnesses stated that the dangers attending the loading of logs were well known in the industry. There was testimony that the bark of hemlock logs sheds easily and that special boots are not helpful. The fact that the stevedore put life lines in the water and stationed a boat nearby is further evidence that the workplace provided by the shipowner was unsafe because of the significant risk of longshoremen falling overboard.

I also believe that the district court improperly directed a verdict in favor of Japan Line, the time charterer. While it is true that Japan Line had no agent or employees on the scene at the time of the accident, this does not end the inquiry. Ja-

---

1. In *Davis,* there was evidence both that the ship's crew had originally placed the gangway in a dangerous position and that the ship's officer on duty "saw and appreciated the danger posed by the gangway." 657 F.2d at 1052. The jury's verdict of negligence could have been premised on either or both of these findings. Similarly, in *Gill,* the court found triable jury issues both in whether the shipowner was negligent in the manner in which it stowed the

paper rolls and in whether the stevedore's use of the breakout clamp was so unsafe that the shipowner "should have intervened to stop the loading operation until it could be done with reasonable safety." 682 F.2d at 1075. Finally, in *Bueno,* we held only that a question of fact existed whether the shipowner had constructive knowledge of a dangerous condition on the vessel. None of these cases precludes the result that I would reach in the instant case.

pan Line, like the other defendants, had a duty to intervene if it could be charged with knowledge of the dangers associated with open stanchions. Since the district court found only that Japan Line had no *involvement* with the loading process, the issue of constructive knowledge is unresolved. Moreover, Japan Line may have been responsible for equipping the vessel and thus would have had a duty to make the vessel a safe place to work.

For these reasons I believe that the directed verdicts should be reversed.