Thomas G. CARPENTER, Plaintiff–Appellant,

v.

UNIVERSAL STAR SHIPPING, S.A., a foreign corporation, and Sealaska Timber Corporation, a foreign corporation, Defendants–Appellees.

No. 88–4059.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1989.

Decided Feb. 12, 1991.

Abraham A. Arditi, Seattle, Wash., for plaintiff-appellant.

Mark C. Manning, Bradbury, Bliss & Riordan, Seattle, Wash., for defendant-appellee Universal Star Shipping.

Steven V. Gibbons, Lane, Powell, Moss & Miller, Seattle, Wash., for defendant-appellee Sealaska Timber Corp.

Before TANG, HALL and BRUNETTI, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Thomas Carpenter, a longshoreman, was injured while loading a ship. He filed suit, alleging negligence against the owner of the ship, Universal Star Shipping ("Univer-

sal"), and the voyage charterer, Sealaska Timber ("Sealaska"), under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq. The district court granted summary judgment for both defendants. We affirm.

## I.

The first Defendant-appellee, Universal, owned the vessel, Pacific Victory, on which Carpenter worked as a longshoreman. The second Defendant-appellee, Sealaska, is a voyage charterer for Alaskan companies that sell their timber to foreign purchasers. Sealaska voyage chartered the Pacific Victory from Daiichi Chuo Kisen Kaisha, a time charterer, and hired West Coast Stevedoring ("West Coast") to load the ship. Carpenter worked as a longshoreman for West Coast, and was loading the Pacific Victory at the time of his accident.

Universal had representatives on hand during the loading of the Pacific Victory. The ship's crew observed the loading of the Pacific Victory primarily to ensure that the logs were loaded onto the vessel correctly. If the logs were to shift during the journey, they could upset the vessel's trim.

As the voyage charterer, Sealaska performed several different tasks. First, it hired subcontractors to sort and bundle the logs according to size and length. Sealaska also provided the stevedore, West Coast, with a "line up." The "line up" prescribed the order in which the logs would be loaded; they were to be loaded in the reverse order of their intended discharge to ensure delivery to the proper buyer. In addition, Sealaska acted as a general coordinator between the various subcontractors who were involved in the overall loading of the Pacific Victory. Sealaska's on-site representative for this job was Mr. Michael York. Mr. York's duties included the supervision and inspection of cargo loading, the preparation of the log loading plan, and the assignment of logs to appropriate holds.

Prior to Appellant–Carpenter's accident, there had been several comments made about the stow to West Coast and to Sealaska, through Mr. York, by various members of the Pacific Victory's crew. Mr. Erada, the ship's chief officer, noticed some "broken spaces in the stow," holes between the piles of loaded logs, after the first day's loading. On the second day of loading, Mr. Erada informed the captain of the ship of these broken spaces. Mr. Erada was concerned about the safety of the stevedores and that the full booking of the ship would not be loaded because of the broken spaces. The captain told Mr. Erada to inform Mr. York of the broken spaces, which he did. Mr. Erada also informed West Coast's general supervisor about the danger the broken spaces represented. Later on the second day of loading, Mr. Erada and the captain again spoke with Mr. York about the broken spaces. On the morning of June 15th, the day of Carpenter's accident, Mr. Erada once again warned Mr. York of the danger. At that time, Mr. York promised to tell his superintendent and the walking bosses about the broken spaces. Later that day, while the crew was attempting to maneuver a bundle of logs into place, Carpenter slipped and fell into a thirty-foot hole between bundles of logs. Carpenter sustained a severe and permanent back injury as a result of the fall.

Carpenter's claims arise under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act"), 33 U.S.C. § 901, et seq. Under the Act, the primary source of relief for injured longshoremen is their right to limited statutory benefits from their employer, regardless of fault. Longshoremen also have a right to sue a limited class of third parties, "vessels," for negligence. See 33 U.S.C. §§ 905, 933; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 268–71, 99 S.Ct. 2753, 2760–62, 61 L.Ed.2d 521 (1979). A vessel that is found liable cannot get contribution or indemnification from even a more culpable employer, since such contribution or indemnification would undermine the limited, but certain, nature of the employer's liability. 443 U.S. at 268–71, 99 S.Ct. at 2760–62. Moreover, the employer has substantial rights to an employee's recovery against a "vessel." First, the employer is entitled to any recovery received by an

# 1542

employee who institutes an action against a "vessel," up to the amount of the benefits received by the employee from the employer. *Id.* at 270, 99 S.Ct. at 2761. Second, an employer that pays statutory benefits to an employee acquires a right to sue third party "vessels" in the employee's name if the employee does not initiate suit against a "vessel" within six months. *Brown v. American Mail Line, Ltd.*, 625 F.2d 221, 222 (9th Cir.1980). The employee's acceptance of benefits thus "operate[s] as an assignment to the employer of all rights of the person entitled to compensation." 33 U.S.C. § 933(b).

Carpenter filed suit against Universal Star and Sealaska under 33 U.S.C. § 905(b), alleging negligence. Both defendants filed motions for summary judgment, and the court granted both motions on the ground that neither defendant owed Carpenter a duty to intervene under section 905(b). Carpenter appeals, claiming that defendants did owe him a duty. Carpenter also claims that Sealaska may be liable on a theory of negligent hiring of the stevedore, and further that the trial court erred in refusing to consider late expert testimony.

This court reviews a grant of summary judgment de novo, *Ford v. Manufacturers Hanover Mortgage Corp.*, 831 F.2d 1520, 1523 (9th Cir.1987), and views all facts in the light most favorable to the nonmoving party. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

## II.

Defendants Universal and Sealaska both concede that they are "vessels" under LHWCA. As a result, both defendants are subject to the duty to avoid negligence that is imposed by section 905(b) of LHWCA. Sealaska nevertheless argues that, as a voyage charterer, it owes a lesser duty of care under LHWCA to longshoremen than do shipowners. We have made no such distinction, but have instead applied the same standards to shipowners and charter-

ers. *See Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204, 1207–09 (9th Cir. 1989); *Bandeen v. United Carriers (Panama), Inc.*, 712 F.2d 1336, 1339–40 (9th Cir.1983); *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300, 1303–04 (9th Cir.1981), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 278 (1982); *see also* 33 U.S.C. § 902(21) (giving no indication that owners and charterers should be treated differently in defining "vessel," inter alia, as the ship's "owner [and] ... charter" (sic)).[1]

## III.

Carpenter claims that defendants negligently failed to intervene with the incompetent stevedore to protect him. The Supreme Court addressed the question whether a negligent failure to intervene by the shipowner could produce section 905(b) liability in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In *Scindia* the Court interpreted section 905(b) in an effort to clear up confusion among the circuits. It held that "there are circumstances in which the shipowner has a duty to act where the danger to the longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Id.* at 175, 101 S.Ct. at 1626. The court went on to state,

> [The stevedore's] judgment [with regard to the defective winch] was so obviously improvident that [the shipowner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch. The same would be true if the defect existed from the outset and [the shipowner] must be deemed to have been aware of its condition.

*Id.* at 175–76, 101 S.Ct. at 1626–27 (footnote omitted). Under *Scindia*, then, a longshoreman must first show that the ves-

---

1. Hereinafter, "shipowner" refers to both Universal Star and Sealaska unless otherwise indi- cated.

sel knew or should have known of a defect in the ship's gear. He must then further show that the vessel knew or should have known that the stevedore's improvident decision to use the defective ship's gear created an unreasonable risk of harm to longshoremen, and that the vessel could not reasonably expect the stevedore to remedy the situation.

■ The Supreme Court in *Scindia* trod cautiously in imposing liability for failure to intervene on the shipowner. The Court was wisely concerned with the possible consequences of the interaction of the stevedore-employer's right to recover benefits paid an employee from a "negligent" vessel under section 933, and an overly broad reading of section 905(b) negligence. A stevedore who negligently causes an accident, and who as a result must pay statutory benefits to an employee, may invoke his right under section 933 to sue third parties in the name of the injured employee. Such a stevedore can sue a "vessel" under section 905(b), and can claim that the "vessel" should have intervened to cure the stevedore's own obvious negligence. If the employer-stevedore wins he will receive, inter alia, the full amount of benefits paid, and to be paid, to the injured employee. *See* 33 U.S.C. §§ 905(b), 933. Thus, if section 905(b) is read to impose liability on an owner for negligence that is in the first instance the stevedore's, LHWCA will put all costs on the party who is least able to avoid the accident, the vessel. More importantly, LHWCA will completely eliminate the incentive to act with caution of the party who is in the best position to avoid the accident, the stevedore.

The *Scindia* Court accordingly strictly limited a vessel's duty to intervene. It is not enough that the vessel knows or should know of a defect, and that the vessel knows the stevedore's actions have resulted in an unreasonable risk to longshoremen. It is further required that a part of the ship itself, the ship's "gear," cause the injury. Such a limitation effectively prevents the misallocation of costs feared by the *Scindia* Court, since it seems that in this specific circumstance the owner is in as good a position as the stevedore to pre-

vent an accident. While the stevedore is in control of the loading operations, the "vessel" runs the ship itself.

We interpreted *Scindia* in *Bandeen v. United Carriers, Inc.*, 712 F.2d 1336 (9th Cir.1983). In *Bandeen*, the longshoreman was injured while loading logs because no safety wires had been rigged between the stanchions on the ship's deck. Bandeen sued the owner and charterer of the ship for negligence under § 905(b). He argued that the owner had a duty to intervene because it knew the stevedore failed to install safety wires. The trial court granted defendants' motion for directed verdicts at the close of the evidence. We affirmed. The *Bandeen* court noted that in those cases in which a duty to intervene had been found either the ship's gear had caused the injury, or the shipowner had affirmatively acted to assume the duty. *Bandeen*, 712 F.2d at 1340. We found no duty to intervene in *Bandeen* because, "... the shipowner's equipment and acts did not cause the injury." *Id.*

Carpenter relies on *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300, 1303 (9th Cir. 1981), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 278 (1982), and *Bueno v. United States*, 687 F.2d 318 (9th Cir.1983), to argue that a duty to intervene exists here. However, neither of these cases is on point.

In *Turner* the cargo of the ship collapsed, injuring an offloading longshoreman. The collapse was the result of a defect in the cargo created by the foreign stevedore who had loaded the ship. Although we found the shipowner liable for a failure to intervene, *Turner* is little help to plaintiff, for a key fact makes the case entirely inapposite. In *Turner* the party that had improperly loaded the cargo and thereby caused injury was a foreign stevedore, not the injured longshoreman's employer.

Because *Turner* involved a foreign stevedore and not the longshoreman's employer, the *Scindia* concern that costs be allocated appropriately was not implicated. *See Turner*, 651 F.2d at 1304. First, in

cases like *Turner* the employer's ability to recover in the name of the employee under sections 905(b) and 933 cannot eliminate the best accident avoider's incentive to take preventive measures, for the employer is not the best accident avoider in this type of case. In *Turner* the employer-stevedore had not loaded the ship, and he therefore had no opportunity to prevent the accident.

Moreover, the safety concerns behind the Act actually support liability when, as in *Turner*, the accident is the product of a foreign stevedore's negligence. The foreign stevedore is the party who has an opportunity to prevent the accident, and vessels *can* sue foreign stevedores, though not a more common stevedore-employer, for indemnity. *Turner*, 651 F.2d at 1304. Thus, in the specific factual context of *Turner*, unlike the case now before us, the employee's action against the vessel could result in an action by the vessel against the negligent foreign stevedore. The prospect of vessel-initiated actions against foreign stevedores provides foreign stevedores with an incentive to perform their work carefully. Since in the instant case the vessel cannot sue the stevedore, *Turner* has no application.

It is also worth noting that the *Turner* court imposed liability because it feared that unless the vessel was liable injured longshoremen would be left "to the mercies of foreign stevedores against which [they] may have no rights or, at least, no practical remedies. *Id.* at 1304. However well-founded the *Turner* court's fear, in the instant case the need to provide a remedy is not so pressing, since the longshoreman has access to his statutory benefits. See 33 U.S.C. §§ 904, 905.

The second case on which Carpenter primarily relies is also inapposite. In *Bueno*, the shipowner voluntarily agreed to make regular safety inspections of sandblasting being done in the hold of its vessel. *Bueno*, 687 F.2d at 320. A fire developed in the hold because of the improper placement of floodlights by the sandblasting contrac-

tor and forced the longshoremen to leave. Bueno later went back to work in the hold and fell through scaffolding burned in the fire. Because the shipowner had voluntarily undertaken a duty to conduct safety inspection of the sandblasting operations, we found the shipowner liable for not intervening to remedy the dangerous scaffold. *Id.* at 320–21. Neither Sealaska nor Universal Star voluntarily undertook a duty to inspect the safety of the cargo loading operation. Therefore, *Bueno* is little help to appellant.

In Carpenter's case, unlike *Scindia* and as in *Bandeen*, the hole in the stow was unrelated to any equipment of the ship. The hole resulted from the improper loading of the logs by the stevedore, something the stevedore, and not the owner, had the expertise to prevent or correct. In addition, neither defendant acted to assume a duty to intervene. Plaintiff thus fails to establish a legal duty to intervene on the part of either defendant.

■ Carpenter alternatively argues that even if Universal had no independent legal duty to intervene in the cargo operations for the safety of the longshoremen, custom imposed a duty to intervene.[2] *Scindia* does recognize that it is necessary to inquire "whether the pertinent statutes, regulations or custom place or assume a continuing duty on the vessel to repair defective ship's *gear* being used by the stevedore in the cargo operation." *Scindia*, 451 U.S. at 176, 101 S.Ct. at 1626 (emphasis added). *Scindia* would thus impose a duty on the vessel to intervene to care for the ship's gear only when custom indicates that the vessel is to care for the ship's gear. Again, *Scindia* tread carefully in imposing a duty to intervene, and liability under sections 905(b) and 933, on vessels.

Carpenter asserts that a vessel is liable under section 905(b) if custom imposes on it a mere duty to oversee cargo operations, rather than primary responsibility for the equipment that causes an accident. However, Carpenter's view is at odds with the

**2.** We do not decide in what circumstances custom evidence can be used to establish a duty to discover dangerous conditions. We decide only

the issue before us; when evidence of custom can establish that the vessel has a duty to intervene.

cost allocation concern that lies behind *Scindia*'s limitation of vessel liability to accidents arising from the ship's gear. It seems desirable to funnel the costs of accidents, and hence the incentive to prevent them, onto the shipowner when the ship's gear causes the accident and custom imposes on the shipowner the duty to maintain the gear. *Scindia* indicates that liability is in this instance appropriate. But if a shipowner is by custom required only to monitor the performance of the stevedore, then the shipowner has less opportunity to prevent an accident than the stevedore. The stevedore, after all, will actually cause the accident. Although it might increase safety to impose liability on both the stevedore and the shipowner, with the shipowner acting as an additional check on the stevedore, that path is closed to us. For if the shipowner is liable, the stevedore is relieved of all liability. See 33 U.S.C. §§ 905(b), 933 (discussed previously). Since no defective ship's gear is involved in this case, Carpenter can not establish that custom imposed on the vessel a duty to intervene.

The *Turner* case does not affect this analysis of custom. Although *Turner* allowed custom evidence to support a finding of shipowner liability, it imposed a duty because liability furthered the safety policies of the Act. As discussed before, the policy rationales of *Turner* do not dictate the same result in Carpenter's case.

In *Scindia*, the Supreme Court also acknowledged that the contract between the stevedore and the shipowner may have provisions that specifically establish a duty to intervene. *Scindia*, 451 U.S. at 176 n. 23, 101 S.Ct. at 1626 n. 23. Carpenter alleges that Sealaska and Universal Star were required by contract provision to intervene in the cargo loading for the safety of the longshoremen.

■ Carpenter relies on Daiichi Chuo Kisen Kaisha's time charter contract and Sealaska's voyage charter agreement to establish that both defendants owed him a contractual duty of care to oversee the cargo loading operations. Clause 62 of the time charter contract provides that "Stevedores, when required, shall be employed and paid for by charterers, but this shall not relieve owners from responsibility at all times for proper stowage, which must be controlled by the master, who shall keep a strict account of all cargo loaded and discharged." Carpenter also relies on Clause 5 of the voyage charter agreement between Sealaska and Universal Star, which states "Charterers to load, stow, lash, secure, trim and discharge the cargo free of risks and expenses to owners." These clauses determine indemnity issues between the owner and the charterer and do not inure to the benefit of the longshoremen. *See Turner*, 651 F.2d at 1305–06.

*Scindia* recognizes that a contract between the *stevedore* and the shipowner may affect the duty the owner owes. *Scindia*, 451 U.S. at 176 n. 23, 101 S.Ct. at 1626 n. 23. However, Carpenter argues that the *charter* contracts affect the duty owed to the longshoremen. Contrary to Carpenter's argument, *Turner* establishes that a contract between the time charterer and the shipowner does not affect the duty owed by the shipowner to the longshoremen. *Turner*, 651 F.2d at 1305. The *Turner* contract read, in pertinent part; "[c]harterers are to load, stow and trim and discharge the cargo at their expense and risk under the supervision of the Captain." *Id.* at 1305 n. 4. We held that the contract "was not relevant to the *duty* owed by either defendant to the plaintiff," but instead related to the indemnity issue between the charterer and the owner. *Id.* at 1305 (emphasis in original). Clause 5 of Sealaska's voyage charter agreement uses similar language and also relates to the indemnity issues between the voyage charterer and the owner. Likewise, Clause 62 of the time charter contract operates as a risk-shifting provision between the time charterer and Universal Star. However, neither clause creates a duty to intervene to ensure longshoremen safety during cargo loading.

Carpenter has thus failed to raise any genuine issues of material fact regarding a duty to intervene on the part of Sealaska or Universal Star under case law, custom, or contract.

**1546**

## IV.

■ Carpenter claims that defendants may be liable under section 905(b) for "negligent hiring." It is said that defendants should have known better than to hire Carpenter's employer. It is then claimed that the fact that defendants nevertheless did hire Carpenter's employer should make them liable under section 905(b). It must once again be recalled that if defendants are liable, they are *solely and exclusively liable*, by operation of section 933.[3]

We have not directly ruled on the issue of negligent hiring in the section 905(b) context. Carpenter's reliance on *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300 (9th Cir. 1981), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 278 (1982), is misplaced. In *Turner* we did hold the vessel liable, but liability was not based on a negligent hiring theory. *Turner* imposed liability because allowing recovery served the safety concerns of LHWCA, as discussed previously. 651 F.2d at 1304.

Carpenter asserts that this court extended *Turner* in *Haluapo v. Akashi Kaiun, K.K., S.A.M., Inc.*, 748 F.2d 1363 (9th Cir. 1984), to create a claim for negligent hiring. Again appellant inaccurately reads our cases. In *Haluapo* a longshoreman who was injured by a defective ship's winch sued a number of section 905(b) "vessels." We found that the time charterer, which had no knowledge of the defect, or control over the defective instrument, had no duty to repair the winch. We then mentioned that the longshoreman "might" have a cause of action against the voyage charterer that had employed the stevedore. *Haluapo*, 748 F.2d at 1365. The language in *Haluapo* does not establish a cause of action for negligent hiring under section 905(b) in this circuit.

Section 905(b) itself does not specify the acts or omissions of the vessel that consti-tute negligence. See 33 U.S.C. § 905(b). Neither does the legislative history give guidance with particularity. It was said that a "vessel's liability was to be 'based on its own negligence' and could be proved only if it was shown 'to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.'" *Scindia*, 451 U.S. at 166 n. 13, 101 S.Ct. at 1621 n. 13 (quoting S.Rep. No. 92–1125, p. 11 (1972)). Within these general guidelines, much was to be resolved through the application of accepted principles of tort law and the ordinary process of litigation. *Id* at 10–11.

The Fifth Circuit addressed negligent hiring in the context of § 905(b) in *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978). In *Hess*, the injured longshoremen sued the shipowner. He claimed, inter alia, that the owner was negligent in hiring his employer, the stevedore. The court held that the employees of the stevedore company cannot sue the shipowner for negligent hiring. *Hess*, 559 F.2d at 1034–35.[4] The Ninth Circuit is disinclined, absent good reason, to create a direct conflict with another circuit. *U.S. v. Larm*, 824 F.2d 780, 784 (9th Cir.1987), *cert. denied* 484 U.S. 1078, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).

Moreover, safety concerns underlying LHWCA dictate a finding that longshoremen should not be allowed to sue vessels for the negligent hiring of their employers. The statute places primary responsibility for longshoremen safety during cargo operations on the stevedore. *Taylor*, 739 F.2d at 1387. Congress established this policy because the stevedore, not the vessel, is in the best position to maintain a safe work environment in the cargo hold. *See Id*. And allowing a longshoreman to

---

**3.** It is worth noting that the Supreme Court in *Scindia* did not mention an action for negligent hiring when setting forth the various circumstances in which a vessel could be found "negligent" for § 905(b) purposes. This omission is far from conclusive, however, since the case before the court did not involve a claim of negligent hiring.

**4.** While the Supreme Court in *Scindia* dealt with parts of the *Hess* decision, the Court did not address the issue of negligent hiring. As a result, *Hess* has not been overruled by *Scindia* and is still reliable authority. *See Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 214 (5th Cir.1984).

sue the vessel for negligent hiring for injuries proximately caused by his own employer would frustrate the intent of the statute by placing responsibility for longshoremen safety wholly on the vessel, not the stevedore. See 33 U.S.C. § 933 (discussed previously). For these reasons, we hold that a longshoreman who is injured by the negligence of his own employer may not sue the shipowner for negligent hiring.

### V.

 The district court refused to consider deposition testimony of Carpenter's expert, Tom Murphy, in support of the custom argument Carpenter raised in opposition to the summary judgment motions. Carpenter sought to introduce such evidence with his motion to reconsider the trial court's first grant of partial summary judgment. The trial court refused, citing Carpenter's tardy submission of the evidence without explanation. We review the judge's decision to disregard Carpenter's late deposition evidence for abuse of discretion. *Alghanim v. Boeing Co.*, 477 F.2d 143, 148–49 (9th Cir.1973); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir.1985).

■ On appeal, Carpenter argues that the affidavit of his expert should be admitted because Sealaska submitted late expert affidavits on May 11, only two days before the date set for the first summary judgment hearing, May 13. Carpenter claims that this late filing by Sealaska prejudiced him because he could not obtain a reply affidavit in time for the scheduled hearing.

Under Fed.R.Civ.P. 56(f), if affidavits needed to support an opposition to a summary judgment motion are unavailable at the time of the motion for summary judgment, the court may refuse to issue the judgment or may order a continuance to allow such affidavits or depositions as are needed to be taken. The opposing party must, however, invoke rule 56(f) by submitting affidavits that indicate why he cannot then present facts essential to justify his opposition to summary judgment.

If the opposing party fails to take advantage of Rule 56(f), summary judgment may be entered if otherwise appropriate. *Thi-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 994 (9th Cir.1980); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 954 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Carpenter did not ask the district court to stay consideration of the summary judgment motion pending the deposition of his expert as provided for in Fed.R.Civ.P. 56(f). The court had sufficient evidence before it to support the motion and did not abuse its discretion in excluding the expert deposition and entering the summary judgment order.

The district court's order of summary judgment for the defendants is AFFIRMED.