**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM LINCOLN, JR.,
            *Plaintiff-Appellant,*

v.

REKSTEN MANAGEMENT,
            *Defendant-Appellee,*

and

NEW ORLEANS COLD STORAGE; GREEN
TUNDRA, her engines, appurtenances,
cargo, apparel, electronics, etc., in
rem,

            *Defendants.*

No. 99-1681

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-98-490-2-23)

Argued: March 3, 2000

Decided: December 29, 2003

Before WIDENER and KING, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded with instructions by
published opinion. Judge Widener wrote the opinion, in which Judge
King and Senior Judge Michael joined.

## COUNSEL

**ARGUED:** Edward Paul Gibson, RIESEN LAW FIRM, L.L.P., North Charleston, South Carolina, for Appellant. Gordon D. Schreck, BUIST, MOORE, SMYTHE & MCGEE, P.A., Charleston, South Carolina, for Appellee. **ON BRIEF:** Allison A. Stover, RIESEN LAW FIRM, L.L.P., North Charleston, South Carolina, for Appellant. Julius H. Hines, BUIST, MOORE, SMYTHE & MCGEE, P.A., Charleston, South Carolina, for Appellee.

---

## OPINION

WIDENER, Circuit Judge:

Plaintiff, William Lincoln, appeals the district court's opinion and order granting summary judgment to the defendant, Reksten Management A.S. (Reksten). *Lincoln v. Reksten Management, A.S.*, No. 2:98-0490-23 (D.S.C. Apr. 14, 1999). Lincoln was injured while loading Reksten's ship, the M/V GREEN TUNDRA (the *GREEN TUNDRA*), with frozen chicken, and he filed this negligence action against Reksten under § 905(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950. Lincoln claims the district court erred because a genuine issue of material fact existed as to whether Reksten breached its turnover duty to Lincoln and because Reksten owed Lincoln, as a third-party beneficiary to the charter party contract, a heightened duty to supervise, inspect, and/or intervene in the stevedore's activities. We affirm in part, vacate in part, and remand.

### I.

At the time of his accident, Lincoln was employed by Stevens Shipping and Terminal Company (Stevens) as a longshoreman. Stevens is a stevedore and was hired to load the *GREEN TUNDRA*, a refrigerator vessel owned by Reksten, with a load of frozen chicken destined for Russia pursuant to a charter party agreement between Reksten and Hudson Foods. The charter party agreement included provisions that Reksten would provide a ship that had decks capable of holding up to five tons and that was fit in every way for the loading of frozen food packed in cartons.

The *GREEN TUNDRA* has three cargo holds or decks, designated A, B, and C from top to bottom. Longshoremen access these decks through four cargo hatches, numbered one through four moving from fore to aft on the ship. The stevedore is required to lower pallets full of boxes of frozen chicken with a crane through the cargo hatches into the cargo holds. Once the crane deposits the pallets in the cargo holds, the stevedore uses forklifts to move the pallets of chicken boxes to designated areas in the cargo hold. The longshoremen remove the chicken boxes from the pallets and hand stack them on the ship's decks in their appropriate locations within the hold.

At the time of his accident, Lincoln was working on deck B.[1] The floor of deck B consists of wooden deck boards bolted to supporting steel I-beams. The deck boards in deck B are approximately ten inches wide and two to three inches thick, and there is an approximately one and a half inch space between each of the boards that allows refrigerated air to circulate between decks B and C. There is no other barrier between decks B and C, so if a board broke on deck B, an object, with no interruption, would fall straight to the floor of deck C.

The *GREEN TUNDRA* arrived in Charleston, South Carolina on July 16, 1996 to receive the load of frozen chicken. Prior to the ship's arrival, the ship's crew had pre-cooled the ship's cargo holds to 20 degrees Fahrenheit, cleaned the holds, and inspected the holds to ensure they were safe and ready for loading. Prior to the loading operations, Stevens' stevedore superintendent conducted a pre-loading inspection of the pre-cooled ship's holds to ensure that they were safe for the longshoremen to work in. Stevens commenced loading the frozen chicken that same day. The evidence is in conflict as to whether Lincoln's accident or the condition of the ship which caused it was reported to the vessel before Lincoln's suit was filed.

At approximately 4:30 p.m. on July 22, 1996, Lincoln was on deck B when his right foot went through the deck boards. Lincoln's right foot and leg went through the boards, causing him to fall down so that he was "resting on [his] tailbone," leaving his foot and leg dangling

---

[1]The evidence is in conflict as to whether Lincoln was in hatch 2 or 4 at the time.

inside hold C. Lincoln's fellow longshoremen working on deck B helped Lincoln out of the hole after it appeared that he could not extricate himself. Lincoln then climbed out of the cargo hold using the ladder. On the dock, he spoke to Lawrence Mixson, the stevedore in the dock office, who states that he reported the accident to the vessel and told Lincoln to go to the hospital. As a result of this fall, Lincoln sustained injuries to his wrist, back, neck, and knee. Another stevedore acting as the safety director for the operation, David LeBlanc, filled out two accident reports documenting Lincoln's fall, one dated July 29, 1996 and another that is not dated.

On March 11, 1998, Lincoln filed this action against Reksten under 33 U.S.C. § 905(b), which provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. . . .

33 U.S.C. § 905(b). After completing some of the discovery in the case, Reksten moved for summary judgment arguing that it had not breached any duties owed Lincoln. The district court granted the motion after finding that Lincoln did not provide sufficient evidence that Reksten breached its turnover duty to Lincoln and that Reksten did not owe Lincoln a heightened duty to supervise and to inspect the hold under either OSHA regulations or its charter party contract with Hudson Foods. Lincoln appeals, claiming the district court improperly granted summary judgment when material issues of fact exist as to whether Reksten breached its turnover duty to Lincoln and claiming the district court erred as a matter of law in concluding that Lincoln was not a third-party beneficiary of a heightened duty of care contained in the charter party contract.

We review a district court's decision granting summary judgment *de novo*. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A party is entitled to summary judgment only if, after viewing the facts in the light most favorable to the non-moving party, it is entitled to a judgment as a matter of law. *Shaw*, 13 F.3d at 798.

## II.

While Congress created a cause of action against the shipowner in negligence in § 905(b), it left to the courts the task of defining the duties the shipowner owed to the longshoreman. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165-66 (1981). In *Scindia Steam*, the Court defined three general duties shipowners owe longshoremen under § 905(b): (1) the turnover duty, which relates to the condition of the ship upon the commencement of stevedoring operations; (2) once stevedoring operations have begun, the duty to exercise reasonable care in order to prevent injuries to longshoremen in areas where the shipowner remains in "active control of the vessel"; and (3) the duty to intervene concerns the vessel's obligations with respect to cargo operations in areas under the principal control of the independent stevedore. *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (construing *Scindia Steam*, 451 U.S. at 167-68). In this appeal, we first consider Lincoln's argument that Reksten breached the first of these duties, the duty to exercise reasonable care when turning the ship over for stevedoring activities.[2]

The turnover duty has two components. The first involves the shipowner's duty with respect to the ship's gear, equipment, tools, and work space that the stevedore will utilize during its operations. The shipowner must "at least [exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Scindia Steam*, 451 U.S. at 166-67.

---

[2]Lincoln argues that Reksten also breached a duty based on provisions in the charter party contract between Reksten and the charterer, Hudson Foods. We address this argument in section III, *infra*.

As a corollary to this initial turnover duty, the shipowner must

> warn the stevedore of any hazards on the ship or with
> respect to its equipment that are known to the vessel or
> should be known to it in the exercise of reasonable care, that
> would likely be encountered by the stevedore in the course
> of his cargo operations and that are not known by the steve-
> dore and would not be obvious to or anticipated by him if
> reasonably competent in the performance of his work.

*Scindia Steam*, 451 U.S. at 167. The duty to warn attaches only to latent hazards, including those in cargo areas, and "[a]bsent actual knowledge of a hazard, . . . the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Howlett*, 512 U.S. at 99-100. If a defect is open and obvious and the stevedore should be able to conduct its operations around it safely, the shipowner does not violate the duty to warn. See *Bonds v. Mortensen & Lange*, 717 F.2d 123, 127-28 (4th Cir. 1983) (finding malfunctioning bell was an obvious defect).

There is no evidence that the rotten wood or hole in the deck that Lincoln fell through was known to either Lincoln or the stevedore or the vessel, so we assume that the defect in the floorboards on the *GREEN TUNDRA* was latent and that Reksten breached the second part of the turnover duty, the duty to warn, by failing to inspect the ship adequately and to warn the stevedore of a hole or rotten flooring in the hold. Under *Scindia Steam*, in order to avoid summary judgment, Lincoln must show that there was a latent defect in the deck, that the shipowner knew or should have known of the defect in the exercise of reasonable care, and that the shipowner breached its duty by failing to discover or warn the stevedore of the defect. *Howlett*, 512 U.S. at 105 (citing *Scindia Steam*, 451 U.S. at 167).

There is no evidence that the hole in the deck through which Lincoln fell, or the rotten wood at that place, was known to the vessel. So the question is whether the vessel should have known of the defect in the exercise of reasonable care so that it might have warned the stevedore of the defect. In this connection, the hole is described in the

record as 6 inches wide and 18 inches long at a place where the space between the planks in the deck should have been 1-1/2 inches.

The affidavit of Captain Helgesen, widely experienced in such marine affairs, describes the state of repair and upkeep of the deck as that which resulted from "evidence that the ship's personnel failed to act reasonably concerning maintenance and upkeep of the vessel." He noted that the coatings on the deck boards had not been maintained, leading to water access to the wood in the deck boards, making them conducive to rot, that holes remained in the wooden decks, "areas that could be repaired were not repaired." He attached photographs to his affidavit illustrating wooden patches in certain decks, unreasonable damage to certain decks, cracks in hatch boards in certain decks, worn and splintered boards in certain decks, steel plates installed over wooden hatch boards in certain decks, and extreme wear of edges of deck boards and surface coatings of certain decks. Captain Helgesen stated that the refrigerated compartments in the ship, of which this was one, were pre-frozen[3] and, on that account, the deck boards might appear quite sound when they, in fact, were not, and should have been inspected before freezing sets in. He stated that decayed wood can be spotted by sounding with a hammer for "[d]eteriorated wood will be spongy when probed."

In this connection, such a state of upkeep of the holds was generally corroborated by Lawrence Mixson, an employee of the stevedore, who was in charge of the loading of the ship. He stated that with the number in the crew down to "a fourth the size that they used to have, I think with the size of the crew they had, they found it very difficult to keep up with what was going on. Regular maintenance was difficult, much less damage that was happening." It was a part of Mixson's job to see that the decks were in working condition, and he probably, in fact, actually inspected the decks prior to the time that loading commenced.[4] Mixson states he reported Lincoln's accident to

---

[3]By pre-frozen it is meant that the temperature in the refrigerated hold was reduced to well below freezing prior to the commencement of the loading of the ship. This enabled the shipper to load frozen chicken directly into the cold holds without delay.

[4]This is not to infer that any negligence on the part of Mixson would be a defense to the suit against the vessel.

the ship's crew but received no report back with respect to the accident. One of the longshoremen testified that the hole Lincoln fell into was later covered up with boxes of chicken.

While we emphasize that the facts we have just related may be stated favorably to Lincoln, Lincoln has no burden in opposing summary judgment to reconcile inconsistent statements in the record. The burden is on the moving party, as we have stated, to show that it is entitled to judgment as a matter of law. In that respect, it is remarkable that an affidavit of Captain Tipnis,[5] a marine surveyor, offered by the vessel, with respect to the inspections of deck boards which would have been required by Helgesen, stated: "In my opinion, to expect the officers and compliment of the *GREEN TUNDRA* to perform detailed inspections of deck boards and deck gratings as suggested by Mr. Helgesen would be both impractical and unreasonable." Despite this excuse for not making inspections as recommended by Helgesen, an affidavit of the ship's bosun states that while he could not "remember any specific repairs which may have been made at that time" he stated "with certainty that all necessary repairs would have been carried out," prior to loading.

An analysis of the foregoing evidence convinces us that the record shows that, taking the present evidence most favorably for Lincoln, the vessel might have been negligent in the maintenance, upkeep, and especially the inspection of the deck in question, so that, in the exercise of reasonable care, it might have discovered the defect or hole in the decking into which Lincoln fell, enabling it to warn the stevedore of the defect.

The summary judgment of the district court in favor of the vessel on this account must be vacated.

---

[5]For our present purposes, we consider Captain Helgesen and Captain Tipnis were each a qualified expert in the fields in which they testified by way of affidavit. Notably, Helgesen concluded "it is my opinion that the vessel was negligent in all respect and that its negligence caused Lincoln's accident." Tipnis's affidavit concluded that the decks "are very well maintained and exhibit only the usual signs of normal wear and tear." This illustrates the conflict in the statements of fact relied on by the parties. We do not at this time accept either conclusion, even if admissible as such.

III.

Lincoln also claims that the district court erred in its finding that the charter party provisions did not inure to his benefit thus creating an additional obligation to those outlined in *Scindia Steam*. The relevant language in *Scindia Steam* is "*absent contract provisions* to the contrary the ship owner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." 451 U.S. 172 (italics added). The contract provisions which Lincoln relies on from the charter party are parts of clauses 19 and 36 of the charter party. Clause 19: "[t]he vessel's holds to be clean, dry and free from smell and in every way fit for holding a cargo of frozen food products in cartons;" Clause 36: "Fully gratingsfitted, suitable for forklifts with rubber tyres upto 5 tons weight incl cargo."

The argument goes that construing these provisions, at least literally and probably over-literally, the fact that the gratings, which were fully fitted, and at one place had a hole or rotten place in them which a man's foot could fall through, were bound to be not "in every way fit for loading" under clause 19 and not "fully gratingsfitted" under clause 36.

In this circuit we have held in *Bernard v. U. S. Lines, Inc.*, 475 F.2d 1134 (4th Cir. 1973), that a longshoreman who was injured in the use of a land-based forklift owned by the charterer was not a third-party beneficiary of the charter party agreement because it "created no contractual duty to the longshoreman on the part of the United States, a time charterer." 475 U. S. at 1135, 1136. Similarly, in *Spence v. Mariehamns R/S*, 766 F.2d 1504 (11th Cir. 1985), a longshoreman who was injured by the stevedore's negligence in the unloading of the vessel was held not entitled to recover from the vessel under a charter party provision which provided that the "Charterers to load, stow and discharge the cargo at their expense under the supervision of the Captain." The Court held that the quoted language was not construed so that the vessel's "crew would take direct responsibility for supervising the discharge of cargo." 766 F.2d at 1507. It reasoned, as did *Bernard*, that the language made no mention of the longshoremen's safety, and the plaintiff had not presented extensive proof of such a duty. In *Car-*

*penter v. Universal Star Shipping, S.A.*, 924 F.2d 1539, 1545 (9th Cir. 1991), the court held that charter party provisions that "stevedores . . . shall be employed and paid for by charterers" and "charterer to load, stow, lash, secure, trim and discharge the cargo free of risks and expenses to owners" determined indemnity issues between the owner of the vessel and the charterer and did not inure to the benefit of a longshoreman who had been injured when he fell through a hole improperly left in the loading of a cargo of logs. The court held, as had *Spence*, that the charter party was a contract between the charterer and the ship owner and did not affect the duty owed to the longshoreman. It held that no language in the charter party created a duty on the ship owner to intervene to insure longshoremen's safety during cargo loading. We especially note that the real basis for such claims is footnote 23 on page 176 of *Scindia Steam*, which provides that "[i]t may also be that the contract between the stevedore and the shipowner will have provisions specifically bearing on the dispute. The contract between Scindia [the owner] and Seattle [the stevedore] is not part of the record in this case [referring to *Scindia Steam]*." There is no provision in the charter party in the case at hand specifically bearing on the dispute at hand. Longshoremen's safety or concomitant care is not mentioned in the charter party. Therefore, we are of opinion, and so hold, that the charter party provision does not offer Lincoln an additional opportunity to sue the owner on account of his injury. At this point, we should note that a construction of the charter party provision involved here so as to give relief to Lincoln would amount to a recovery on the ground that the ship was not seaworthy. Even if the fact of unseaworthiness be true in the abstract, the ability of a longshoreman to sue the ship because not seaworthy instead of for negligence was abolished by the Longshoremen's and Harbor Worker's Compensation Act of 1972. *Scindia Steam, Part II*, 451 U.S. at 164, et seq.

We thus hold that the charter party provisions involved do not support a cause of action on behalf of Lincoln. The decision of the district court is affirmed in that respect.

The decision of the district court is accordingly affirmed in part and vacated in part, and the case is remanded for action not inconsistent with this opinion.

*JUDGMENT VACATED IN PART AND*
*REMANDED WITH INSTRUCTIONS*