Anthony QUEVEDO, Plaintiff–Appellant,

v.

TRANS–PACIFIC SHIPPING, INC.; BHP–International Marine Transport, Defendants–Appellees.

No. 97–15817.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 1998.

Decided May 12, 1998.

Thomas J. Boyle, Law Offices of Thomas J. Boyle, San Francisco, CA, for plaintiff-appellant.

Eric Danoff, Kaye, Rose & Partners, LLP, San Francisco, CA, for defendant-appellee Trans–Pacific Shipping Co.

James J. Tamulski, Kaye, Rose & Partners, San Francisco, California, for defendant-appellee BHP–International Marine Transport.

Before: WHITE,* Associate Justice, (Ret.), JOHN T. NOONAN, JR. and THOMAS, Circuit Judges.

---

* The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

WHITE, Associate Justice, (Ret.):

On August 6, 1995, plaintiff-appellant Anthony Quevedo, a longshoreman employed by Stevedoring Services of America (SSA), was injured while he and other longshoremen were unloading the cargo vessel PACPRINCESS in Richmond, California. Following his injury Quevedo was paid worker's compensation by SSA pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et. seq.* He also filed suit in the Northern District of California against defendant-appellee Trans–Pacific Shipping, Inc., the owner of the vessel; Trans–Pacific filed a third party complaint against defendant-appellee BHP–International Marine Transport, the vessel's time charterer, claiming indemnity against its own potential liability.

On appeal, Quevedo challenges two rulings of the district court. The district court ruled that plaintiff's proffered expert testimony was inadmissible because plaintiff, in the judge's view, had inexcusably not complied with the deadline for naming his expert and filing his report. The judge also granted motions for summary judgment filed by Trans–Pacific and BHP. The plaintiff timely appealed both rulings; and we have jurisdiction under 28 U.S.C. § 1291. We affirm both rulings of the district court.

Neither party disputes the legal standards applied by the district judge for deciding a summary judgment motion. Federal Rule of Civil Procedure 56 provides that if it is shown that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, the motion shall be granted. The Rule also provides that the adverse party may not rest upon the allegations or denials of that party's pleading, but must set forth specific facts that show there is a genuine issue for trial.

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We review a grant of

summary judgment de novo, and draw all inferences in the light most favorable to the nonmoving party.

## I

■ We deal first with the exclusion of the evidence proffered by plaintiff's expert. On April 29, 1996, the district court issued a pretrial order requiring plaintiff to designate his experts and disclose any reports by February 1, 1997. Plaintiff submitted his designation of the one liability expert allowed by the court twenty days late, but did not provide the reports and statements of his expert witness as required by Fed.R.Civ.P. 26(a)(2) until he submitted his opposition to the defendants' motions for summary judgment on March 14, 1997. Plaintiff never sought an extension of time from the district court. Nor did he express disagreement with the limitation to one liability expert although given the opportunity to do so. The court ruled that "[b]ecause plaintiff has failed to justify his disregard for the Court's April 29, 1996 Order, the untimely report of Captain Bishop will not be considered for purposes of this motion for summary judgment." We review this ruling for abuse of discretion and hold that the district court did not abuse its discretion in disregarding the untimely designation and report of plaintiff's expert. *See Carpenter v. Universal Star Shipping, S.A.,* 924 F.2d 1539, 1547 (9th Cir.1991).

## II

The merits of this case turn upon 33 U.S.C. § 905(b), which provides a longshoreman with the right to recover damages caused by the negligence of the vessel. This section has been subject to considerable interpretation. *See Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 165, 101 S.Ct. 1614, 1620–21, 68 L.Ed.2d 1 (1981); *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 96, 114 S.Ct. 2057, 2062, 129 L.Ed.2d 78 (1994). The Supreme Court has explicitly limited the duties imposed by § 905(b) on vessel owners. *See Scindia Steam,* 451 U.S. at 172, 101 S.Ct. at 1624–25; *Howlett,* 512 U.S. at 101, 114 S.Ct. at 2064–65; *see also Carpenter,* 924 F.2d at 1543. In *Carpenter* we noted that if courts were to interpret § 905(b) to impose liability on a vessel owner for the negligence of the stevedore, the LHWCA would become a vehicle for longshoremen to "put all costs on the party who is least able to avoid the accident, the vessel. More importantly, LHWCA will completely eliminate the incentive to act with caution of the party who is in the best position to avoid the accident, the stevedore." 924 F.2d at 1543.

■ It is now accepted that shipowners owe three narrow duties to longshoremen: a turnover duty; a duty to exercise reasonable care in the areas of the ship under the active control of the vessel; and a duty to intervene. *See Howlett,* 512 U.S. at 98, 114 S.Ct. at 2063. The plaintiff claimed in the district court that the vessel violated each of these three duties. The district court rejected each of these claims. We affirm the district court.

## A

■ The turnover duty in this case is limited to warning the stevedore of latent dangerous defects in the ship or its cargo which are known or should be known to the ship and which would not be recognized or anticipated by the experienced stevedore. *See id.* at 105, 114 S.Ct. at 2066–67. Here the ship was carrying a cargo of steel pipes, some longer than others. The pipes were being discharged by the use of one or more slings carrying one or more bundles of pipes bound together by steel bands. Plaintiff Quevedo was a "hold" man whose job included hooking the slings to the hooks on the bridle at the end of the arm of the crane which was used to discharge the steel pipe cargo. We are told by his Opening Brief at 6–7 that:

> [a]s soon as the hatch was opened, it was apparent that the loads that could be seen (at the top of the hatch) were piled unevenly and at various angles to each other. There were two cargo surveyors at the scene, acting on behalf of the vessel's interests, one of whom photographed this defective condition and the stevedore's attempts to deal with it while lifting these first loads out of the hatch using the ship's crane....

At about 10 a.m. and after the stevedores had struggled with about 10 of these

misshapened and unbalanced loads, one of more pipes fell off a load while it was lopsidedly suspended from the crane. This set in motion a chain of events that culminated in one or more other pipes rolling down, striking and pinning Mr. Quevedo's left foot.

Plainly enough, if the condition described was a dangerous one, it was surely not a latent danger and was immediately known to the stevedore. Plaintiff's brief has conceded as much.

We also learn from the Joint Statement of Undisputed Facts at 4 that:

[j]ust before Quevedo's injury, a load of bundles of pipe was about to be lifted out. The crane driver lifted the load up about three or four feet. At least one of the bundles was at an angle, and the load had been stopped while the crane drivers were changing over. Quevedo claims that one or more pipes slid down off the load, causing one or more pipes to land on his left foot and ankle.

During the discharging before the accident no member of the Vessel's crew was in the hold. About ten minutes before the accident the Chief Mate came to the main deck area above the No. 5 hold.

Before the accident the longshoremen discharged the cargo using the slings already in place around the bundles of pipe. After Quevedo was removed from the Vessel, discharge work proceeded without any significant problems.

Howlett is instructive with respect to the turnover duty to warn. The Court said "[i]t bears repeating that the duty attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." 512 U.S. at 99, 114 S.Ct. at 2064. In addition, the Court observed that the vessel's duty to warn is confined to latent hazards that are known to the vessel or should be known to it in the exercise of reasonable care. *Id.* at 99–100, 114 S.Ct. at 2063–64. Furthermore, the Court said that "shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow." *Id.* at 104, 114 S.Ct. at 2066; *see also Scindia,* 451 U.S. at 172, 101

S.Ct. at 1624–25. "For the purposes of delineating the scope of a shipowner's turnover duty, then, the cargo stow is separate and distinct from other aspects of the ship," and the ship's turnover duty is a narrow one. *Howlett,* 512 U.S. at 104–05, 114 S.Ct. at 2066–67.

■ It is incredible that the stevedore was not aware of what the plaintiff calls a defect in the stow. No reasonable jury could consider the alleged unstable condition of the loads to be latent. Hence the ship had no duty to warn: "[T]here can be no recovery under § 5(b) for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence." *Howlett,* 512 U.S. at 104, 114 S.Ct. at 2066; *see also Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622.

Quevedo argues that the slings were defective in that they were not "choked" or "hog tied", which is described by Quevedo as looping the slings around and over the top of the pipes so that their suspended weight draws them together tightly. Appellant's Reply Br. at 4. But if not being choked is a defect in the stow, surely an experienced and expert stevedore would know immediately that these slings were not choked because the loads of pipe prior to Quevedo's injury were unstable and not held tightly together. Appellant's Opening Br. at 6–7. Furthermore, Appellant's Reply Brief at 4 states that "[i]t is only when an individual load is lifted up by the crane ... that it appears that the green straps are not choked." Hence, it is incredible that the longshoreman and stevedore did not know that the slings were not choked. The vessel thus need not have warned of this condition even if it was aware of it.

**B**

■ The active control duty is the duty of care that vessel owners owe longshoremen if the owners actively involve themselves in cargo operations. The district court held that plaintiff presented no evidence to demonstrate that the vessel actively controlled a cargo unloading area. The Joint Statement of Undisputed Facts at 4 reveals that "[d]uring the discharging before the accident no member of the Vessel's crew was in the hold"

and that the Vessel's Chief Mate came to the main deck above Hold No. 5 approximately ten minutes before plaintiff's injury.

The issue is whether vessel personnel directed the unloading operation, not whether, as plaintiff argues, the slings were returned to the ship or were left on the dock. Indeed, in *Scindia,* the defective gear in question was a winch that was a part of the ship's gear. The Court rejected any suggestion that the vessel has control of cargo operations simply because a (defective) part of the ship's gear is being used by the stevedore. *See Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626. We agree with the district court that there is no evidence that the vessel actively controlled the stevedore's work.

### C

■ Quevedo also alleges that the shipowner breached its intervention duty because Chief Mate Yu warned of danger resulting from the stevedore leaving some loads in the hold stacked at a higher level than other loads, but did not immediately act to turn off the power to the crane used for lifting the loads. The duty to intervene, however, is a narrow one. A vessel owner has "no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172, 101 S.Ct. at 1624–25. Relying on *Torres v. Johnson Lines,* 932 F.2d 748, 750–51 (9th Cir. 1991), *Bjaranson v. Botelho Shipping Corp.,* 873 F.2d 1204, 1207 (9th Cir.1989), and *Bandeen v. United Carriers (Pan.), Inc.* 712 F.2d 1336 (9th Cir.1983), the district court ruled that vessel owners owe longshoremen the duty to intervene if the owners (1) know of a hazardous condition; (2) realize or should have realized that the condition presents an unreasonable risk of harm to the longshoremen; (3) know that the stevedore has failed to remedy that situation; and (4) helped to create the hazard.

Immediately before the accident, Chief Mate Yu warned the stevedore that the unloading was proceeding in an unsafe way, but as the district court held, there was no evidence that Yu had "reason to believe that SSA would not correct the problem," which is an essential element in proving a breach of the duty to intervene. *See Carpenter,* 924 F.2d at 1542–43. Thus, plaintiff's argument that the shipowner breached its intervention duty fails.

### CONCLUSION

The judgment of the district court is AFFIRMED.