Joseph CLAY, Jr., Husband
of/and Ora Clay

v.

DAIICHI SHIPPING and the
M/V Atlantic Bulker, in
Rem et al.

No. Civ.A. 97–3630.

United States District Court,
E.D. Louisiana.

Nov. 10, 1999.

Lloyd N. Frischhertz, Seelig, Cosse, Frischhertz & Poulliard, New Orleans, LA, for Plaintiffs.

Daphne P. McNutt, McGlinchey, Stafford & Lang, New Orleans, LA, John Harold Clegg, Gina M. Venezia, McGlinchey Stafford, PLLC, New Orleans, LA, for Defendants.

John Links Duvieilh, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Intervenor–Plaintiff.

### *ORDER AND REASONS*

FALLON, District Judge.

Before the Court is the motion of defendants Japan Ship Owners' Mutual Protection & Indemnity Association, Daiichi Chuo Kisen Kaisha and Astraea Maritime S.A. (collectively "Vessel Interests") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' claims against them. For the following reasons, the defendants' motion for summary judgment is GRANTED.

## I. BACKGROUND

Plaintiffs Joseph and Ora Clay filed this suit to recover for injuries Joseph Clay sustained while working as a longshoreman for intervenor/plaintiff Cooper/T. Smith Stevedoring Co. ("Cooper") aboard the ATLANTIC BULKER, which is

owned by the defendant Vessel Interests.[1] The vessel departed Japan in February 1995 with the cargo in the No. 1 Hold consisting of steel coils, bundled steel pipe and loose steel pipe destined for Houston, Texas, and New Orleans, Louisiana. After arriving in Houston, cargo was discharged from the forward end of the hold without incident. On April 10, 1995, the vessel arrived in New Orleans, where Cooper inspected and accepted the cargo for discharge. Cooper's day shift longshoremen unloaded the bundles of steel pipe without incident. At approximately 4:45 p.m., the day gang began discharging the 40′ long, 18″ loose steel pipes from the No. 1 Hold. The longshoremen removed the loose pipes using pipe hooks and a spreader bar attached to the ship's No. 1 cargo crane. Some or all of the pipes were stowed against the ship's bulkhead and had to be "broken out" to be discharged. Though there are different methods for "breaking out" pipes, in this case the longshoremen apparently would lift the forward end of the pipe with a pipe hook attached to the ship's crane and then pull the pipe; this would cause the pipe to move and create a space between the aft end pipes and the bulkhead into which the other pipe hook could be inserted; with hooks in both ends, the pipe could then be lifted out of the hold. At 6:00 p.m., the day shift ended and the night gang continued to discharge the loose pipes with the equipment and following the same procedures used by the day crew. At approximately 6:45 p.m., Clay, who was part of the night gang, was lifting a loose pipe in order to place a pipe hook in the lower end. The pipe hook slipped out of the pipe end, allowing the pipe to roll toward Clay. The pipe rolled over Clay, amputating his left leg. Clay collected his statutory compensation through Cooper and then filed suit against the Vessel Interests under § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Plaintiffs alleged that Joseph Clay's injuries were caused by the negligence of the Vessel Interests. Cooper intervened, seeking reimbursement for payments made to Clay.

In their motion for summary judgment, defendants contend that the undisputed facts of this case establish that the Vessel Interests did not breach any duties owed to plaintiff Joseph Clay as a matter of law. Specifically, defendants assert that the undisputed facts demonstrate that (1) the ATLANTIC BULKER was turned over in such a condition that expert and experienced longshoremen could carry on cargo operations with reasonable safety and that all conditions in the cargo stow were open and obvious; (2) Clay's accident occurred in an area over which the defendants did not maintain any active control; and (3) the actions of the stevedore were not so obviously improvident that the vessel's crew had a duty to intervene in the discharge operations.

Plaintiffs respond that issues of fact remain as to all three of the duties enunciated in *Scindia Steam Navigation v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In particular, plaintiffs maintain that the stowage of the steel pipes against the bulkhead constituted an unreasonably dangerous condition that could not be discharged with reasonable safety, that the presence of the ship's chief mate on the deck above the hold and/or ship's crew members in the hold during discharge leaves an issue as to whether the unloading operations were under the active control of the vessel, and that the presence of the chief mate on deck creates an issue of fact with regard to whether defendants breached a duty to intervene in the stevedore's operations.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment will be granted only if the pleadings, depositions, answers to

---

**1.** For purposes of this case, the defendants have agreed to have their contingent liabilities assessed jointly without regard to their respective positions as the time charterers and owners of the ATLANTIC BULKER. See Defs.' Supp. Mem. 5 n. 2.

interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the defendant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir.1995). "[A] dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When evidence of contradictory facts has been submitted, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). To oppose a motion for summary judgment, the non-movant cannot rest on mere allegations or denials but must set forth specific facts showing that there is a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321–22, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden of demonstrating the existence of a genuine issue is not met by "metaphysical doubt" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5 th Cir.1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The Court must "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contrary facts." *Id.* The Court does not, "in the absence of proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial. *See Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348. Finally, "the mere existence of some factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be genuine and material." *Willis*, 61 F.3d at 315. "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment." *Id.*

## III. ANALYSIS

### A. Vessel Liability Under Section 905(b)

Plaintiffs brought this action under the third-party liability provision of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). Section 905(b) gives a longshore worker the right to file a third-party suit against a shipowner for personal injuries sustained during cargo operations aboard the owner's vessel. This section has an interesting history.

Prior to 1972, vessel owners were strictly liable under the maritime doctrine of unseaworthiness for injuries sustained by longshore workers due to unsafe conditions on a vessel. *See Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Although absolutely liable to injured longshore workers, vessel owners were able to shift the costs in certain instances by recovering from the stevedore employers on the theory that they had breached an expressed or implied warranty of workmanlike performance. *See Ryan Stevedoring v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Stevedores could thus be held liable for both tort damages and workers' compensation. This frustrated the very purpose of the LHWCA, which trades tort immunity for fixed no-fault compensation liability. To eliminate this inconsistency, which some commentators dubbed the "tortured liability triangle," Congress in 1972 amended the LHWCA. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 7–10, at 435 (2d ed.1994).

The extensive 1972 amendments preserved the longshoreman's statutory com-

pensation remedy against the stevedore-employer, increased the level of compensation, did away with the vessel owner's strict liability for a vessel's unseaworthiness and abrogated the vessel owner's right of contribution against the stevedore. *See Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 97–98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). Amended § 905(b), however, retained the longshore worker's third-party action against the vessel owner but required that it be based on a vessel owner's negligence. *See id.* at 97, 114 S.Ct. 2057. This change was designed "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Id.*

From its inception, the § 905(b) negligence remedy has proven difficult to define. *See generally* Schoenbaum, § 1, at 441. Even today it still appears to be a work in progress. *See generally Howlett v. Birkdale Shipping Co. S.A.,* 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994); Samuel A. Keesal, Jr. et al, *Shipowners' Liability for Longshoremen Personal Injuries: The Supreme Court Blocks the "Importation" of Unseaworthiness,* 7 U.S.F. Mar. L.J. 67 (1994). A brief review of the contours of this remedy is helpful.

In response to a conflict among the circuit courts the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), defined the scope of a vessel owner's duty under § 905(b). The plaintiff in *Scindia,* Lauro De Los Santos, was a longshore worker who had been injured while working in loading operations aboard a vessel owned by Scindia Steam Navigation Co. *See Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 158, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). De Los Santos was injured when a braking mechanism in the vessel's winch, which had been malfunctioning for two days prior to the day of plaintiff's accident, failed. *See id.* at 160, 101 S.Ct. 1614. The winch's failure caused sacks of wheat to fall on De Los Santos in the vessel's hold. *See id.* De Los Santos filed suit against Scindia under § 905(b) of the LHWCA. *See id.* at 158, 101 S.Ct. 1614. The district court granted summary judgment for the vessel, the Ninth Circuit reversed, and the Supreme Court granted certiorari. *See id.* at 159, 101 S.Ct. 1614.

■ After reviewing the discord that existed among the appellate courts that addressed the third-party liability scheme created by the 1972 amendments, the Supreme Court concluded that a vessel may be liable under § 905(b) in three instances:

1) if the vessel owner fails to turn over a reasonably safe ship or fails to warn on turning over the ship of hidden defects of which it knew or should have known;

2) if the vessel owner fails to remedy hazards under the active control of the vessel;

3) if the vessel owner fails to intervene in the stevedore's operations when it has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

*See id.* at 167–78, 101 S.Ct. 1614. Thus, the vessel owner's duties under § 905(b) as defined by *Scindia* include: (1) a turnover duty; (2) an active control duty; and (3) a duty to intervene. *See Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. The facts in *Scindia* implicated the vessel owner's duty to intervene. *See Scindia,* 451 U.S. at 175–76, 101 S.Ct. 1614. The Supreme Court affirmed the Court of Appeals after finding that a triable issue existed as to whether the shipowner had actual or constructive knowledge of the defect in the ship's winch. *See id.* at 178, 101 S.Ct. 1614. In the present case, plaintiffs claim the defendant Vessel Interests breached all three *Scindia* duties. At this point it is appropriate to analyze the facts of this case in relation to each of those duties.

**B. The Turnover Duty**

■ The turnover duty relates to the condition of the vessel prior to or at the

commencement of stevedoring activities. This duty places two responsibilities on the vessel owner: (A) to exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedore can carry on cargo operations with reasonable safety to persons and property, and (B) to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it in the exercise of reasonable care. *See Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. The responsibility of the vessel owner to warn of hidden dangers, however, is narrow. *See id.* at 105, 114 S.Ct. 2057. It does not include dangers which are either (1) open and obvious, or (2) something a reasonably competent stevedore should anticipate encountering. *See id.; Wilfred v. M/V CAPE CORNWALL,* No. CIV.A.97–0008, 1997 WL 567948, at *2 (E.D.La. Sept. 9, 1997). Thus, a vessel owner has not breached its duty to warn if the defect causing the injury is either open and obvious or one that a competent longshoreman should have seen. *See Howlett,* 512 U.S. at 105, 114 S.Ct. 2057; *Greenwood,* 111 F.3d at 1246. This concept is often referred to as the open and obvious defense. *See Greenwood,* 111 F.3d at 1246–47.

■ This defense is clearly applicable to the vessel owner's turnover duty to warn. The question presented in the instant case, however, is whether it is applicable or relevant to the shipowner's turnover duty to provide a reasonably safe vessel.

The Supreme Court in *Howlett* discussed the impact of an open and obvious hazard in the cargo stow. In *Howlett* a ship's boom lifted a draft of cargo out of the ship's hold, exposing an eight square foot area. *See Howlett,* 512 U.S. at 94, 114 S.Ct. 2057. Howlett, a longshoreman assisting in the discharge operation, jumped down about three feet to this exposed area, where he slipped and fell on a sheet of clear plastic that had been improperly placed under the cargo by the loading

stevedore. *See id.* Howlett filed suit against the vessel owner under § 905(b). The vessel owner raised the open and obvious defense, and the district court granted summary judgment for the vessel owner holding that since the hazardous area was open and obvious, the vessel owner had no duty to warn. *See id.* at 95, 114 S.Ct. 2057. The Court of Appeals affirmed. *See id.*

On review, the Supreme Court discussed the vessel owner's turnover duty and observed that the cargo stow is separate and distinct from other aspects of the ship, such as the ship's gear and equipment. *See id.* at 104, 114 S.Ct. 2057. The Court reasoned that the vessel's crew have direct access to and control over the ship itself and its gear, equipment and tools. *See id.* The vessel owner's responsibilities to inspect these areas of the ship are commensurate with the crew's access and control. *See id.* In contrast, the vessel owner or crew does not have the same access to or control over the cargo stow. Therefore, a vessel owner's duties with respect to the cargo stow are limited. *See id.* at 105, 114 S.Ct. 2057.

The Supreme Court concluded that the vessel owner's turnover duty to warn is narrow and encompasses only those hazards that are known to the vessel owner and not known to the stevedore. *See id.* Moreover, the exercise of reasonable care does not require the vessel owner to supervise the ongoing operations of the loading stevedore or to inspect the completed stow. *See id.*

Although *Howlett* confirmed the applicability of the open and obvious defense to the turnover duty, it restricted its discussion to the duty to warn by noting that "[a]lthough both components [the duty to supply a safe vessel and the corollary duty to warn] are related in various respects, Howlett confines his case to an allegation that Birkdale failed to warn...." *Howlett,* 512 U.S. at 99, 114 S.Ct. 2057. Thus, *Howlett* is not dispositive on the question of whether the open and obvious defense is

applicable to the turnover duty to provide a safe vessel. *See* Samuel A. Keesal, Jr. et al, *Shipowners' Liability for Longshoremen Personal Injuries: The Supreme Court Blocks the "Importation" of Unseaworthiness*, 7 U.S.F. Mar. L.J. 67, 106–08 (1994).

Shortly after *Howlett,* the Supreme Court revisited this area of the law in *Scindia Steam Navigation Co. v. Riggs,* 512 U.S. 1216, 114 S.Ct. 2701, 129 L.Ed.2d 830 (1994). In *Riggs,* a longshoreman was injured aboard a vessel while off-loading cargo. *See Riggs v. Scindia Steam Navigation Co.,* 8 F.3d 1442, 1443 (9th Cir. 1993). The uncontested evidence, including expert testimony, indicated that the on-loading stevedore had improperly stowed the cargo of pipes and that the pipes were strewn throughout the hold in an open and obviously hazardous manner. *See id.* at 1443. The longshoreman brought suit against the vessel owner asserting that the owner and time charterer had negligently failed to provide him a reasonably safe place to work. *See id.* The district court granted summary judgment for the vessel owner, holding that the vessel had no legal duty to prevent or alleviate the unsafe conditions in the cargo hold because the dangers were open and obvious to the longshore workers. *See id.* The Ninth Circuit Court of Appeals reversed, holding in effect that the open and obvious defense did not absolve the vessel owner of the turnover duty to provide a reasonably safe vessel. *See id.* at 1448. Under the Ninth Circuit's reasoning, an

open and obvious hazard may be unreasonably dangerous and, therefore, constitute a breach of the turnover duty to provide a reasonably safe vessel. The Supreme Court granted certiorari and in a terse but clear opinion wrote that "the judgment is vacated and the case is remanded to the United States Court of Appeals for further consideration in light of *Howlett v. Birkdale Shipping Co., S.A."* *Scindia Steam Navigation Co. v. Riggs,* 512 U.S. 1216, 114 S.Ct. 2701, 129 L.Ed.2d 830 (1994). On remand the Ninth Circuit announced that "consistent with the *Howlett* decision, we now affirm the district court's grant of summary judgment to the vessel." *Riggs v. Scindia Steam Navigation Co., Ltd.,* 35 F.3d 1466 (9th Cir.1994). A fair reading of these opinions compels the conclusion that the open and obvious defense is applicable to the turnover duty to provide a safe vessel and that a vessel owner has no legal duty to prevent or alleviate an unsafe condition in the cargo hold resulting from an improper stow when the condition is open and obvious to longshore workers.[2] While this result seems harsh, it is motivated by the conviction that a contrary result would put all costs on the party who is least able to avoid the accident: the vessel. *See Quevedo v. Trans–Pacific Shipping, Inc.,* 143 F.3d 1255, 1258 (9th Cir.1998).[3] More importantly, it is believed that imposing liability on the vessel owner would completely remove the incentive to act with caution from the party who is in the best position to avoid accidents: the stevedore.[4] *See id.*

---

**2.** Like the Court of Appeals in *Riggs,* plaintiffs rely in part on the turnover duty of safe condition as stated in *Martinez v. Korea Shipping Corp., Ltd.,* 903 F.2d 606, 609–10 (9th Cir.1990) and *Woods v. Sammisa Co., Ltd.,* 873 F.2d 842, 852 & n. 13 (5th Cir.1989). However, in light of *Howlett* and the subsequent history of *Riggs,* that reliance is misplaced.

**3.** The Honorable Byron R. White, Retired Justice of the United States Supreme Court, sitting by designation.

**4.** This is not to say that the open and obvious defense absolves a vessel owner of liability

under the turnover duty in every conceivable set of circumstances. For example, one can posit a situation in which a stow is so dangerous that it is virtually impossible to off-load without injury. A vessel owner who participated in such a stow would not likely escape liability. Nevertheless, those are not the facts of the instant case. This Court is also not certifying that the reasoning underlying the current state of the law is unassailable. There is a contrary view that the vessel owner has the economic clout to compel safety and that by placing the economic burden on the vessel owner, accidents can best be avoided. *See Italia Societa per Azioni di Navigazione v.*

■ In the present case, plaintiffs assert that issues of fact remain as to whether the condition that caused Joseph Clay's injury—steel pipes stowed against the bulkhead—was open and obvious. The evidence does not support this assertion. The deposition testimony of several of the longshoremen in the vessel's hold on the evening of the accident indicate that the discharge crew recognized that the steel pipes were stowed against the bulkhead.[5] Even Joseph Clay testified that when he arrived at the ship, he knew that the pipe was against the wall of the ship. *See* Defs.' Ex. B at 82, 85. He further testified that the crew employed the "break-out method" of discharge because the pipes were against the aft bulkhead of the hold. *See* Defs.' Ex. B at 104. Not only did Clay notice the position of the pipes, but his testimony indicates that before beginning the job, Cooper's foreman told Clay that the position of the cargo required that the crew break out the pipes. *See* Defs.' Ex. B at 105, 112.

Furthermore, on the day of Clay's accident, the day crew began unloading the loose pipes from Hold No. 1 at approximately 4:45 p.m. until the night crew resumed the job at 6:00 p.m. It is uncontested that Clay was injured at about 6:45 p.m. Thus, the longshoreman unloaded the pipes, which plaintiff maintains were all against the bulkhead, for approximately two hours prior to the injury-causing accident. Even assuming that the stevedore's surveyor did not know of the pipes' position at 8:00 a.m. after inspecting and accepting the cargo for discharge, the Court finds that the longshoremen personally worked with the stow for too long to claim that the condition of the stow was not open and obvious.

Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); *Delome v. Union Barge Line Co.*, 444 F.2d 225, 229–30 (1971).

5. The deposition summaries of Eddie Ellis, Glenn Robb, Manuel Gilbert and Joseph Clay, which were provided by plaintiffs, all indicate

Plaintiff also argues that there is a question of fact as to whether the light available in the vessel's hold contributed to Clay's injury. However, plaintiff has not produced evidence, by affidavit or otherwise, to support this conclusion. In his deposition, Joseph Clay testified that he could see the pipes, he could see the hooks in the pipes, and that he could see generally. *See* Defs.' Ex. 4 at 144. When asked what was dangerous about the job at the time of the accident, Clay answered that the danger was breaking out pipe that was stowed against the back bulkhead. *See* Defs.' Ex. 4 at 146. Sylvester Nelson, the longshore flagman, testified in his deposition that he was able to see the longshoremen, the signals, the load and that there was no problem with visibility. *See* Defs.' Ex. 3 at 31–32. Finally, plaintiff fails to present evidence tending to show that the light in the hold was a hidden or latent defect that was any more apparent to the vessel owner than the longshoremen within the vessel's cargo hold.

At oral argument, plaintiff's counsel also argued that another latent defect in the stow was the gap between the pipes he was standing on. But there is no evidence that the alleged gap contributed to Clay's injury, that it was hidden from his view or that the vessel owner knew of this space between pipes within the cargo hold. Finally, plaintiff simply gives no explanation of how a gap between pipes within the cargo stow constitutes a hazard that "would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of [his] work." *Howlett*, 512 U.S. at 105, 114 S.Ct. 2057.

Plaintiffs also allege that the longshoremen had no alternative but to unload the pipe or face adverse employment action. Plaintiff submits deposition testimony

that the position of the pipes against the wall made discharge more difficult and dangerous. Though their accounts differ as to when they first noticed the position of the stow, none of the men assert that this condition was not readily apparent.

from several Cooper employees who surmise that if they had complained or refused to discharge the cargo, they probably would have been out of work. At best, this amounts to general observations or speculation. What plaintiff fails to present, however, is any evidence that the longshoremen made any complaint or were told to continue working. Like the plaintiff in *Greenwood*, general observations or speculation about adverse action are not a substitute for specific evidence that the longshoremen were told to continue working. *See Greenwood*, 111 F.3d at 1248.

The Court finds that the position of the pipes against the bulkhead was an open and obvious condition and defendants did not breach their turnover duty. As to plaintiffs' assertions that other conditions caused Joseph Clay's injuries, plaintiff has failed to produce evidence that those conditions caused the harm, were any less obvious to the vessel than to the longshoremen, or that the conditions were otherwise hidden or latent. Thus, plaintiffs' claims against the Vessel Interests under the first of the *Scindia* duties must fail as a matter of law.

## C. The Active Control Duty

█ Plaintiffs generally contend that there is evidence that the second Scindia duty, which requires a vessel owner to exercise reasonable care to prevent injuries to longshoremen in the areas that remain under the active control of the vessel, was breached. Plaintiffs assert that the fact that the defendants formulated a loading plan and supervised loading operations in Japan deprive them of the open and obvious defense under *Couch v. Cro–Marine Transport, Inc.*, 44 F.3d 319 (5th Cir.1995). This argument is unpersuasive because it is undisputed that the loading of the cargo was conducted by Japanese Supercargo. As the Supreme Court observed in *Howlett*, most vessels assume responsibility for preparing stowage plans, while the expert stevedores implement the plans. *See Howlett*, 512 U.S.

at 103, 114 S.Ct. 2057. The vessel's role in dictating where the cargo will be stowed does not in itself justify imposing liability on the vessel owner. *See id.; see also Breaux v. United States*, No. 95–2924, 1996 WL 626328, at *4 (E.D.La. Oct. 23, 1996) (a prerequisite to vessel liability under the second *Scindia* duty is active control by the vessel over the actual methods and operative details of the longshoremen's work). There is simply no evidence in the record that the Vessel Interests assumed the role of the loading stevedore like the defendant in *Couch*.

Plaintiffs also point to the fact that the vessel's chief officer was on deck over the hatch at the time of the accident as evidence that the cargo unloading was under the active control of the ship. However, the deposition testimony provides no evidence that the longshoremen were being directed by anyone other than the longshore foreman or other agents. This Court is unable to locate any proof that any of the defendants' agents actively controlled Cooper's unloading operations.

At oral argument plaintiff's counsel averred that members of the vessel's crew were in the No. 1 Hold at the time of the injury-causing accident. Even if crew members were in the cargo hold, there is no evidence that a vessel crew member gave any instruction to a Cooper employee. To the contrary, a review of the deposition transcripts indicates that members of the vessel's crew were at most bystanders during the discharge operations. Even if crew members were in the hold around the time of discharge, under *Howlett* the crew members must hold a position that would justify attributing their knowledge or control to the vessel. *See Howlett*, 512 U.S. at 106–07, 114 S.Ct. 2057. There is no evidence to suggest that the crew members in the hold held such positions. Accordingly, plaintiffs' claims under the second Scindia duty must also fail.

## D. The Duty to Intervene

█ Finally, plaintiffs suggest that the defendants should have intervened to

prevent the longshoremen from continuing with an unreasonably dangerous job. A vessel owner may rely on the stevedore's expert knowledge, including the stevedore's judgment that a condition, although dangerous, is safe enough on the whole to permit work to continue. *See Greenwood,* 111 F.3d at 1249; Douglas M. Muller & Julius H. Hines, *Recent Developments in Maritime Law,* 22 Tul. Mar. L.J. 513, 524 (1998). Nevertheless, the vessel owner has a duty to intervene when it has actual knowledge that the stevedore's longshore workers are using defective equipment or engaging in an unsafe work practice which is creating a hazard and that the stevedore in the exercise of obviously improvident judgment intends to work on in the face of it and, therefore, cannot be relied on to remedy it. *See Pimental v. LTD Canadian Pacific Bul,* 965 F.2d 13, 15 (5th Cir. 1992). In short, before the duty to intervene is triggered, the vessel owner must (1) have actual knowledge of the hazard and (2) have reason to believe that the stevedore improvidently intends to continue work in the face of it. *See Greenwood,* 111 F.3d at 1248. The Fifth Circuit has held that the shipowner's responsibility under the third *Scindia* duty "is narrow and requires something more than mere shipowner knowledge of a dangerous condition." *Singleton v. Guangzhou Ocean Shipping Co.,* 79 F.3d 26, 28 (5th Cir.1996) (internal citations omitted). In order for a stevedore's judgment to appear obviously improvident, that expert stevedore must use an object with a defective condition or follow a procedure that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account. *See Greenwood,* 111 F.3d at 1249 (citing *Randolph v. Laeisz,* 896 F.2d 964, 971 (5th Cir.1990)).

■ In this case, it is undisputed that Cooper has discharged the defendants' cargo, which consists primarily of steel cargo, in New Orleans for twenty to thirty years. *See* Plas.' Ex. 43 at 3. Several witnesses testified about the various methods of "breaking out" steel pipe, indicating that the discharge of steel pipe against a bulkhead, while difficult, is not an abnormal or extraordinary condition. *See* Defs.' Ex. A at 15–22; Defs.' Ex. B at 104–05; Defs.' Ex. H at 3. Furthermore, there is no dispute that Cooper has unloaded loose steel pipe stowed against a bulkhead before, including for these defendants, by employing the same break out procedures. *See* Plas.' Ex. 43 at 20–21. Plaintiffs fail to explain how the Vessel Interests should have known that the actions of the stevedores, who in the past had employed the same methods to unload steel cargo in the same condition and for the same company, were so hazardous as to be "obviously improvident" and in need of intervention by the shipowner. Under the facts of the present case, the defendant had no duty to intervene.

## IV. CONCLUSION

This Court finds that the defendant Vessel Interests did not breach their turnover duty to the stevedore because plaintiffs' own evidence demonstrates that the injury-causing condition was open and obvious and the Vessel Interests were entitled to rely on "an independent contractor hired for its expertise in the stowage and handling of cargo." *Howlett,* 512 U.S. at 103, 114 S.Ct. 2057. Further, plaintiffs have not presented sufficient evidence such that a reasonable jury could find that defendants breached the second or third *Scindia* duties.

For the foregoing reasons, defendants motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED. Plaintiffs' claims against the defendants are dismissed with prejudice, each party to bear its own costs.