[775 NYS2d 23]

DIMITRIOS TSAROPOULOS et al., Respondents-Appellants, v STATE OF NEW YORK, Appellant-Respondent. (Claim No. 93902.)

First Department, April 13, 2004

### APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General* of State of New York (*Robert M. Goldfarb* and *Andrea Oser* of counsel), for respondent.

*DiJoseph & Portegello, P.C. (Arnold E. DiJoseph, III* of counsel), for appellants.

### OPINION OF THE COURT

SULLIVAN, J.

This is an appeal from a judgment of the Court of Claims against the State of New York, which, after trial, awarded damages to claimant, Dimitrios Tsaropoulos, for injuries he sustained during the course of repairs to the ship on which he was working. Claimant was the employee of an independent contractor under contract to the United States, which owned the ship, the *Empire State,* and furnished it to the State University of New York Maritime College (SUNY Maritime) for training purposes. The State's appeal brings up for review (*see* CPLR 5501 [a]) the court's prior interlocutory judgment, which,

pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), held the State 35% liable for the injury, ascribing 65% of the liability for the accident to claimant and his employer.

At the time of the accident, the *Empire State* was docked at the SUNY Maritime facility in the Bronx. The ship was furnished to SUNY Maritime pursuant to a federal statute permitting the Secretary of Transportation, in conjunction with the United States Maritime Administration, to provide vessels to state maritime academies for use as training vessels (*see* 46 USC Appendix § 1295c; 46 CFR 310.4). Under the program, the United States retained title to the ship, which the state operated, supplying the crew. Before the United States furnishes a ship to a state, it is to be "repaired, reconditioned, and equipped . . . as necessary for use as a training ship" (46 USC Appendix § 1295c [c] [1] [A] [i]; *see also* 46 CFR 310.4 [United States must furnish training ships "in condition found to be in class by the American Bureau of Shipping and certificated by the U.S. Coast Guard"]). Even after furnishing a vessel to a state, the United States is responsible for maintaining the ship in "good repair" (46 USC Appendix § 1295c [c] [1] [A] [iv]; *see also* 46 CFR 310.4 [e] [1]). The state is responsible for "usual preventive maintenance" (46 CFR 310.4 [e] [2] [i]), and for "exercis-[ing] reasonable care to safeguard the interests of the Administration and avoid (i) injury to any person aboard the Training Ship, and (ii) loss and damage of every nature with respect to the Training Ship" (46 CFR 310.4 [a] [1]).

Pursuant to its statutory duty to maintain the ship, the United States, on November 18, 1993, awarded a contract, to which the State of New York was not a party, to B&A Marine Company, Inc., claimant's employer, to perform repairs to the *Empire State*. The United States assigned Gerald McNamara of the Department of Transportation/Maritime Administration as the contracting officer's technical representative (COTR) for the contract. To facilitate his oversight responsibilities, McNamara maintained an office on the *Empire State* during B&A's performance of the contract. The contract provided that "[a] mutual inspection of the entire vessel by the COTR and [B&A] shall be conducted prior to commencement and upon completion of the contract."

The contract further provided that the "[w]ork shall be accomplished under the direction of [B&A's] capable and competent supervision. Supervisor shall be on-site during any and all

periods that work under these specifications is being actively pursued" (emphasis in original). B&A "shall ensure that the facilities, work standards and practices used in the performance of this contract, and those pertaining to employee health and safety . . . comply with all applicable Federal, state and local regulations." B&A agreed that it would "supply safety inspections and hazard preventing measures in line with modern safety principles, and be responsible for the maintenance and safety of vessel and personnel while working onboard." The contract permitted United States representatives "to engage in normal maintenance activities provided such activities do not interfere with the performance of the Contract" with the caveat that "[s]uch persons shall be bound by the work practices and procedures of [B&A] with respect to safety." The agreement required that B&A "provide all labor, material and services to perform work in accordance with specifications incorporated herein" and further provided that "[e]xcept when specified in writing from the COTR, [B&A] shall not use any of the vessel's spare parts, equipage, material, equipment in the prosecuting of the specification" (emphasis in original).

On December 27, 1993, the date of the accident, B&A was performing work on the *Empire State*, supervised by its president, its technical director and his assistant coordinator. The *Empire State* has an overhead monorail system, comprised of an I-beam on which a trolley with a hoist attached runs, for moving heavy equipment from the ship to the dock. The I-beam runs through a passageway across the ship, connecting the two side ports; it also turns and enters the engine room over an open area. The system is equipped with extension rails that extend the track some 10 to 15 feet outside of the ship so that materials can be lowered onto the pier. "Stops" are used at the end of the I-beam to prevent the trolley from falling off the track. As the I-beam exits the engine room, it is interrupted by composite doors that, for fire safety reasons, usually remain closed. To accommodate the doors, the I-beam contains a detachable section of the track, a "spool piece" which, when attached, locks and latches into place. The extension is removed to allow the doors to close. Ordinarily, when the trolley is transporting a piece of equipment in or out of the engine room, the doors are opened and the spool piece, which is kept outside the engine room doors in a rack set up specifically for that purpose, is attached.

On the date in question, claimant, a ship mechanic for 27 years, and another B&A employee, Pavlos Velisaris, with 30

years of similar experience, were moving a large pipe, weighing approximately 400 pounds, suspended by the hoist attached to the trolley on the I-beam, from the engine room to the hallway. Without opening the engine room doors and placing the detachable section of the rail in place at the doorway gap, claimant and Velisaris moved the trolley with the pipe attached to the hoist toward the end of the rail on the engine room side of the closed doors. Velisaris was holding the pipe at the back end. Claimant opened one of the doors and placed one hand on the handle of the other door while he reached with his other hand to pull a butterfly latch to enable him to open the unopened door. Without the spool piece in place to extend the rail, however, the trolley and hoist fell off the end of the I-beam just inside the doors. The pipe landed on claimant's right hand, still on the handle of the unopened door. As a result, claimant had to undergo a surgical amputation of a finger. He subsequently underwent a second surgery to excise a neuroma and months of physical therapy.

In his testimony, claimant acknowledged the need to put the extension piece of rail in place to provide a continuous track to clear the engine room doorway. Insofar as is relevant, Velisaris testified that he had used the same type of hoist "many times." He knew that there should be a stop at the end of a track and that, with his experience, he should have ensured that there was a stop before he used a hoist. He did not check that day to see whether there was a stop; nor did he explain why he and claimant did not attach the extension piece to the track, which would have obviated the need for a stop.

Claimant's expert testified that a trolley track should have a stop to prevent the trolley from overrunning the end of the track. He acknowledged that "[i]n this particular case, the rail could be extended so you couldn't put up a permanent stop" because "when you added [the connector] to extend the rail outside the sides of the vessel through a hatchway, you would have a permanent stop in its way." Notwithstanding, he believed that a temporary stop could have been placed on the end of the track inside the doors when the extension was not in place.

The deposition testimony of SUNY Maritime's chief engineer on the *Empire State*, read in evidence, revealed that he did not supervise any of B&A's work; only the United States COTR, McNamara, was entitled to do so. He testified that under its contract with the United States, B&A was required to have on-site supervisors to oversee the work. While McNamara consulted

him as to whether he was satisfied with B&A's work, his judgment had no binding effect since McNamara was responsible for all final decisions.

After a bifurcated trial on liability only, the court found the State 35% liable and attributed the remaining 65% of culpability to claimant and B&A. Specifically, the court found that the trolley and hoist would not have come off the I-beam had a stop been attached at its end. As it stated, "[I]t was negligent not to either use a stopper or link up the two railings on either side of the door with the connecting spool piece." The court failed to apportion any liability to the United States, noting that "it cannot be concluded that McNamara knew or should have known that the large pipe was moved in an unsafe manner." An interlocutory judgment was then entered, apportioning liability accordingly. The matter thereafter proceeded to a trial on damages and final judgment. We reverse and dismiss the claim.

The LHWCA (33 USC §§ 901-950) establishes a comprehensive federal workers' compensation program that provides marine workers and their families with medical, disability and survivor benefits for work related injuries and deaths. Under the Act, the injured worker's employer, regardless of fault, must pay statutory benefits; the employer is shielded from any further liability to the employee (see 33 USC §§ 904, 905 [a]). The worker, however, may seek damages against "the vessel"—defined as "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member" (33 USC § 902 [21])—based on negligence under 33 USC § 905 (b), which in pertinent part provides:

> "In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . , and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred."

Enacted in 1972 as part of extensive amendments to the LHWCA (see Pub L 92-576), section 905 (b) was designed to remedy "an anomalous and intolerable situation with respect to actions by longshoremen and harbor workers against shipowners" (Kakavas v Flota Oceanica Brasileira, S.A., 789 F2d 112, 117

[2d Cir 1986], *cert denied* 479 US 853 [1986]). As the Court explained in *Scindia Steam Nav. Co., Ltd. v De Los Santos* (451 US 156 [1981]), prior to 1972, an injured maritime worker could receive multiple recoveries, i.e., compensation payments from his employer and also damages from the shipowner under the doctrine of unseaworthiness, which "required no proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel" (*id.* at 164). Indeed, the shipowner could be found liable "even though the condition was caused, created, or brought into play by the stevedore or its employees," a circumstance that could lead to a recovery by the shipowner against the stevedore (*id.* at 164-165).

The 1972 amendments "shift[ed] more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer" (*Howlett v Birkdale Shipping Co., S.A.*, 512 US 92, 97 [1994]). As a result, the employee's compensation payments were substantially increased, the employee's right to sue the shipowner for unseaworthiness was abolished and the employer's obligation to indemnify the shipowner was eliminated (*Scindia*, 451 US at 165; *see Howlett*, 512 US at 97). The employee's right to sue the shipowner for negligence, however, was preserved in section 905 (b), which, as noted, provides for a right of action against the vessel, defined to include the shipowner.

In *Scindia*, the Supreme Court expounded on the extent to which the vessel's duty of care to warn of or eliminate a dangerous condition on board ship is qualified by its reasonable reliance on the expertise of the stevedore.[1] The "basic theme of the *Scindia* opinion is the extensive reliance that a shipowner may justifiably place on an independent contractor" (*Kakavás*, 789 F2d at 118). Thus, the vessel is required to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warn[ ] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that

---

1. Although *Scindia* addresses the standard of liability "in terms of stevedoring operations, [the] jurisprudence generally has extended this reading of the section 905 (b) negligence action to other independent contractors falling under the Longshore and Harbor Worker[s'] Act" (*Manuel v Cameron Offshore Boats, Inc.*, 103 F3d 31, 33 n 6 [5th Cir 1997]).

would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work" (*Scindia*, 451 US at 167; *see Howlett*, 512 US at 105 ["the vessel's turnover duty to warn of latent defects . . . is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work"]).

Thus, the *Scindia* standards are based upon "the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations" (*Scindia* at 171). "[I]mposing a duty upon vessels to supervise and inspect cargo operations for the benefit of longshoremen then on board would undermine Congress' intent in § 5 (b) to terminate the vessel's 'automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore,' . . . and to foreclose liability 'based on a theory of unseaworthiness or nondelegable duty' " (*Howlett*, 512 US at 101-102, quoting *Scindia*, 451 US at 168, 172).

In addition, the vessel may be liable if it actively involves itself in cargo operations and negligently injures a longshoreman or if it "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation" (*Scindia*, 451 US at 167). Finally, the vessel has a limited "duty to intervene" in the stevedoring operation where it has actual knowledge both of a hazardous condition and that the stevedore, in the exercise of "obviously improvident" judgment, plans to continue work anyway (*id.* at 175).

Given this precedential background against which the merits of the instant claim must be assessed, there is no liability with respect to the vessel's "turnover duty" because under no fair interpretation of the evidence could the trolley system used by claimant and Velisaris to transport the pipe be considered defective or unreasonably hazardous such that an expert and experienced stevedore, exercising reasonable care, could not have safely carried out the operation (*see Scindia*, 451 US at 167). Indeed, as the trial court recognized, "[W]hat was involved represented more of a procedure, than an unsafe structure or piece of equipment."

It is undisputed that to carry the pipe out of the engine room on the trolley and hoist, all that was required was to open the fire safety doors and attach the connecting spool piece to the track. As the ship's chief engineer testified, "If you were transporting something, obviously you would open the double doors and connect the rail." It is also undisputed that the connecting piece was readily available on a rack just outside the doors. Indeed, claimant was quite familiar with the procedure, testifying that "if you wanted to continue, you have to use another connection" known as a spool piece. Thus, since the gap in the track was open and obvious, the connector, necessary to permit effective use of the trolley, was readily available, and the closed doors served to alert any experienced worker that the track did not extend continuously out of the engine room, no defective or hazardous condition attributable to the vessel existed.

The trial court concluded that "it was negligen[ce] not to either use a stopper or link up the two railings on either side of the door with the connecting spool piece." Even accepting that it was negligence not to employ one of these alternatives,[2] the court never explained, nor could it have, how any negligence could logically be attributed to the vessel where one of the alternatives, the connecting spool piece, was readily available at the site for use by the workers. Thus, even under the trial court's theory of the case, where the piece of equipment designed to accomplish the task safely was present, but never properly used by claimant and his experienced coworker, there was no defective or unreasonably hazardous condition present for which the vessel could be held liable (*see e.g. Kakavas*, 789 F2d at 119 [reversing finding of shipowner's liability for allegedly unsafe equipment under *Scindia* where "there was nothing unsafe about it"; instead, employees had engaged in unsafe procedure]). The principle to be distilled is that an unreasonably hazardous condition, chargeable to the vessel, is not presented where the equipment necessary to transport the pipe safely was provided and available at the site, but not used. The fact that a

2. The court's statement that affixing a stopper to the end of the rail was one of "two methods that would have accomplished the task safely" reflects an apparent misunderstanding as to the required operation. A stop at the end of the rail would not have permitted the trolley and hoist to remove the pipe from the engine room. The stop would have had to be removed to permit the trolley to extend past the doors, a procedure that still would have resulted in a stopless end of the track for the period required for the proper placement of the connecting spool piece on the track.

different mechanism, not available, might have prevented the accident but which, by itself, could not have completed the transportation process and would have, in any event, required the use of the equipment that was made available, does not denote negligence on the part of the vessel.

Moreover, even if the condition could possibly be considered as defective or hazardous, it was still not a hazard that was "not known by the [contractor] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work" (*Scindia*, 451 US at 167). As noted in *Bjaranson v Botelho Shipping Corp., Manila* (873 F2d 1204, 1207-1208 [9th Cir 1989]):

> "With respect to the turnover duty of safe condition, the Supreme Court in *Scindia* did not state unequivocally that the ship and its equipment must be in a safe condition. Rather, in preparing the ship for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an 'expert and experienced' stevedore. This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them" (*see Howlett*, 512 US at 98 [ship need only be " 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property' " (quoting *Federal Mar. Terms., Inc. v Burnside Shipping Co.*, 394 US 404, 416-417 n 18 [1969])]).

Thus, it is well settled that "the defendant has not breached its duty to turn over a safe vessel if the defect causing the injury is open and obvious and one that the [worker] should have seen" (*Pimental v LTD Canadian Pac. Bul*, 965 F2d 13, 16 [5th Cir 1992]; *see Howlett*, 512 US at 99 ["It bears repeating that the duty attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations"]). The standard is not, as the trial court obviously believed, whether in hindsight, an open and obvious defect might have been remedied at minimal cost. A shipowner is not

required to anticipate the action or inaction of a careless worker (*Ludwig v Pan Ocean Shipping Co., Ltd.*, 941 F2d 849, 852 [9th Cir 1991]).

As the record makes clear, any hazard confronting claimant was open and obvious and should have been anticipated, recognized and safely negotiated by an expert and experienced marine mechanic exercising reasonable care in his work. To even the inexperienced layperson, the record pictures of the I-beam approaching the doors reveal hat the beam ends before the doors, that it has no temporary stop and that a connecting piece is necessary to extend the track past the doors to move the hoist and the piece of machinery being carried out of the engine room. Inasmuch as both doors were closed as claimant and his coworker approached them, they should have been alerted to the fact that the spool piece would be needed to transport the pipe past the engine room doorway. Thus, the track's end could hardly be characterized as a "hidden danger" (*Scindia*, 451 US at 167) chargeable to the vessel (*see Quevedo v Trans-Pacific Shipping, Inc.*, 143 F3d 1255, 1259 [9th Cir 1998] [vessel not liable where "(i)t is incredible that the stevedore was not aware of what the plaintiff calls a defect in the stow" and "(n)o reasonable jury could consider the alleged (defect) to be latent"]).

Claimant's coworker conceded that he neglected to check, as he should have, whether there was a stop at the end of the trolley track. Had either of them made such a check, he would have noted its absence and realized that the trolley, with a 400-pound pipe attached to the hoist, would fall unless he had first attached the spool piece connector. The State cannot be charged with having reasonably anticipated this patently unsafe operation from an expert and experienced contractor (*see e.g. Kirsch v Plovidba*, 971 F2d 1026, 1033 [3d Cir 1992]; *Keller v United States*, 38 F3d 16, 34 [1st Cir 1994]).

The testimony of claimant's expert does not alter this conclusion. While he testified that a temporary stop inside the doors could have prevented the hoist from falling, he did not explain why the lack of one was unreasonable where the only way the track could be used to transport the pipe out of the engine room was by attaching the extension piece, and the use of such a piece would have obviated the need for a stop. Nor did he identify any custom or practice requiring the use of a stop where a connecting piece was readily available. Thus, his testimony, even if credited, was insufficient to establish the vessel's negligence under *Scindia*.

*Plotkin v State of New York* (197 AD2d 498 [1993]), upon which claimant relies, provides a useful contrast. There, the ship worker accidentally came into contact with an unprotected carbon dioxide release valve, which released gas that asphyxiated him. The trial court found that the failure to shield the valve with a protective screen or other similar device brought about an unreasonably dangerous condition and held the State, as custodian of the ship, liable. Citing *Parks v United States* (784 F2d 20 [1st Cir 1986]), this Court affirmed and held that "the State was responsible for taking preventive safety measures with regard to the carbon dioxide cable that released the gas," resulting in the worker's death by asphyxiation (*Plotkin* at 498). In *Parks*, a worker was injured because of a defectively designed and installed machinery guard. *Plotkin* and *Parks* offer good examples of latent, dangerous conditions that would not be obvious to or anticipated by a reasonably competent worker, a situation not present here.

Nor may liability be found against the State under the other limited duties of the vessel identified by the *Scindia* court in addition to the turnover duty. The State did not "actively involve[ ] itself" in B&A's operation; nor was the trolley or the area in which the accident occurred under the State's "active control" during the transport of the pipe (451 US at 167). There is no evidence that the State had knowledge that B&A, in the exercise of "obviously improvident" judgment, planned to continue working in the face of an allegedly hazardous condition and could not be relied upon to remedy it, so as to trigger a duty on the part of the State to intervene (451 US at 175-176). As the record shows, the State had no notice that claimant and his coworker were going to use the hoist in an obviously hazardous manner by not attaching the readily available connector.

The State also argues that the contract between the United States and B&A explicitly prohibited B&A workers from using the ship's equipment, including the trolley system and hoist at issue, without written permission from the COTR, and that therefore it had no reason to believe that any hazard would be encountered by B&A and its workers in the course of their operations. This is an issue we need not reach in light of our determination that the State owed no duty to claimant which was breached. Similarly, we do not reach the issue of damages, which the State argues were excessive as to pain and suffering, past and future, or the State's argument that if any liability is attributed to the vessel, the greater portion should be attributed

to the United States, which furnished the ship and which had the primary obligation to maintain it and to oversee B&A's performance under the contract.

Accordingly, the judgment of the Court of Claims of the State of New York (Alan C. Marin, J.), entered on or about March 26, 2003, bringing up for review an interlocutory judgment (same court and Judge), entered May 29, 2001, which, following a trial, found defendant State of New York 35% liable for claimant's injury and which, after a damage trial, awarded claimant, before apportionment, damages totaling $738,117, should be reversed, on the law, without costs or disbursements, the judgments vacated and the claim dismissed. The Clerk is directed to enter judgment accordingly.

ANDRIAS, J.P., SAXE and GONZALEZ, JJ., concur.

Judgment, Court of Claims of the State of New York, entered on or about March 26, 2003, bringing up for review an interlocutory judgment (same court), entered May 29, 2001, reversed, on the law, without costs or disbursements, the judgments vacated and the claim dismissed. The Clerk is directed to enter judgment accordingly.